Virginia Liles et al., Appellees, v. Gerald F. Liles,
Appellant.

Gen. No. 9,632.

Opinion filed December 13, 1948. Released for publication January 8, 1949.

RINAKER, SMITH & HEBRON, of Carlinville, for appellant.

MURPHY & MURPHY, of Carlinville, for appellees.

MR. PRESIDING JUSTICE DADY delivered the opinion of the court.

This appeal is to review an order of the circuit court concerning the custody of a child.

Gerald and Virginia Liles were married in January 1942. Their only child, Linda Lee Liles, was born on September 25, 1942.

On August 14, 1945, Virginia filed in said court her complaint for divorce on the ground of extreme and repeated cruelty. On the same date Gerald entered his appearance, thereby stating that he agreed that all orders, including his default, might be entered without notice. On August 17, 1945, she was given a decree of divorce. The decree found that she was a fit and proper person and earning sufficient money for the support of herself and Linda. The decree ordered that she have the custody of Linda until the further order of the court, that she receive no alimony, and that the question of the support of Linda be reserved.

On April 1, 1948, Gerald filed a motion to modify the decree so as to give him the future custody of Linda. So far as is material the motion alleged that Virginia had abandoned Linda and was not a fit and proper person to have her care and custody.

On April 15, 1948, Virginia filed her answer in which she denied she abandoned Linda and was unfit to have her care and custody.

On April 15, 1948, Otis Graham and Mabel Graham, the parents of Virginia, by leave of court, filed a counterclaim in which they alleged Linda had lived with them since she was aged about three months; that during a portion of such time their daughter Virginia also resided with them; that at the date of the divorce decree Gerald agreed with them that they might continue to have the care and custody of Linda, and that a change of custody would not be for the best interest of Linda. They asked that their daughter continue to have such custody, or, in the alternative, that they be given such custody until the further order of the court. The reply of Gerald denied that the Grahams were entitled to have such custody.

On June 2, 1948, after hearing the evidence, the court ordered that the care, custody and education of Linda be taken from Virginia and given to Otis Graham and Mabel Graham until the further order of the court. Gerald appeals from such order.

Gerald was inducted into the army in January 1944, and was in service about 24 months. Before his induction he was employed for a time in Alton, Illinois, where Linda was born and lived with her parents for about six weeks. They then returned to Virden, Illinois, and there lived with the Grahams. Thereafter Gerald was employed in Utah for about six months, and during a portion of such time Virginia and Linda lived there with him. They then returned to Virden and for a time lived with the Grahams. Thereafter, and before being inducted, Gerald was employed in Alaska for about eight or nine months, during which time Virginia and Linda lived with the Grahams. When Gerald returned from Alaska he also lived with the Grahams for a time and then he and Virginia lived in a home which they rented or owned. At that time Gerald and Virginia took Linda to such home, but Linda cried so they returned her to the Grahams where Linda has since lived.

At the time of the divorce Virginia was living in a house formerly occupied by her and Gerald. She apparently continued to live in such house, and for at least a part of the time lived there with a married man named Anderson and with some girls of questionable character. In October 1947, Virginia went to some place in Michigan where she has since lived. Apparently Virginia has not lived with her parents since the divorce, but during the Christmas period of 1947 she and Anderson stayed at the Graham home for about ten days. Mrs. Graham testified that, ''I do know that Anderson was a married man and that he and Virginia did run around together. I talked to Virginia about it.

Anderson's car is 'still at our house.' " She further testified that Virginia "Is home now and has not gone back to Michigan yet." Mr. Graham testified that Virginia was home during the Christmas vacation of 1947, "She came home and stayed with us. I never did hear of a man named Anderson and he did not stay at our home on any occasion, and he also didn't have any room rented at my house. He never spent as much as a night of the Christmas vacation. I was there all the time and it looks like I ought to know. I don't know whose car that is parked at my house. . . . Virginia was here a few days ago, but I don't know where she is now. I saw her last Monday and that's two days ago."

Although Virginia filed her answer to the motion of Gerald, she did not testify, and her failure to testify is not accounted for. She has joined the Grahams as appellees in this appeal.

As to the conduct of Virginia, it is our opinion the proofs clearly show she is not a fit or proper person to have the custody of Linda.

The Grahams have lived in Virden, Illinois, for many years. They own their home, an "average home" with "modern facilities." Mr. Graham is aged 70 years and retired. In active life he was a butcher by trade. Thereafter he was employed on W.P.A. For about the last three years he has been receiving an old age pension of $40 per month. Mrs. Graham testified "he is not so well. . . . Just old I guess." Mr. Graham testified he was in good health. Mrs. Graham is aged 66 years and in good health. She does housework and a few washings for other families, and earns about $75 a month. When she is at work away from home Mr. Graham takes care of the child.

Soon after his discharge from the army Gerald worked for about four months in St. Louis, Missouri. In August 1947, he began work as sales manager on a commission basis for his present employer, who owns

two cemeteries. His earnings have averaged about $85 per week in such employment. Since then he has lived and lives in Ottawa, Illinois, with his present wife Emma, to whom he was married on January 21, 1947. She is aged 21 years and in good health, and at the time of the trial expected a child to be born to her in August 1948. Gerald and his wife now live in a 30 foot house trailer, fully paid for, purchased new in October 1947, Gerald testified "a new home is now under construction for me by my employer. It is a modern home." His employer testified "I am now building a new modern home which should be completed within the next two months for Mr. Liles."

As to the attitude of Gerald and his present wife toward Linda,—the evidence shows the following: He testified he discussed the matter of bringing Linda into his present home with his present wife and that she was very much in favor of having her, that "since our divorce I have contributed snow suits, dresses, shoes, slips, under clothes and some money for Linda's support. I have given her money several times. I gave money to the Grahams for her but they would not take it. . . . I did not make regular monthly payments as my divorce decree did not call for them. . . . I love my daughter and it is my desire that the court award her to me. . . . Before Virginia and I were divorced there was an arrangement between us about the custody of the child. I said Linda would be better off with her grandmother than with her own mother. I did not say I wanted the child to stay with the grandmother or that I would never take her away from the grandmother. . . . In the last five or six months I have visited Linda twice a month and maybe more. . . . Linda is attached to her grandparents, but I am also attached to Linda. I have gone with Linda to Sunday school but due to my work I have not been able to do so regularly. . . . I did not try to get Linda earlier because I had to wait until I got

money to make a home for her. . . . The shoes I bought were $5.00 a pair and I bought two pairs. The snow suit was $20.00. Sometimes I gave the Grahams money. One time I gave the Grahams $5.00 to take her to a doctor and they wanted to give it back. . . . One time I sent $20.00 worth of clothes to Linda from Nashville, Tennessee. . . . I made an allotment for Virginia and the baby when I was in the service." Gerald's present wife testified that she and Gerald had discussed the question of the custody of Linda and "I certainly will be willing for her to come and live with us. When we came to see Linda I always tried to have something for her, a balloon or sucker or something. I have bought clothes for her and so has Gerald. My husband also bought a little pup that cost $25.00. When we would bring these presents the Grahams would act like they didn't want it. Linda has kissed me and made over me. . . . We have always tried to come down to Virden two times a month. I guess I have visited Linda about 48 times. We didn't try to get Linda earlier because houses were hard to get. . . ." Mrs. Graham testified "Linda's health has been good. However, Gerald wanted her taken to a doctor to have her checked upon and he gave me $5.00. . . . Gerald did visit Linda every day when he was in town, but there would be two or three months when he would not be in Virden. He treated Linda all right then and mistreated her only once and that was when he got mad at Virginia and whipped Linda. Gerald's wife was usually with him when he picked up Linda for his visits with her. . . . I liked Gerald allright until he was going to take the baby. He made a living all right for Virginia when they lived together. He always treated us allright. I like Gerald." Mr. Graham testified "We have always got along with Gerald until now, never had any words with each other until now. . . . We treat him just like a son. Linda also treats him allright. Gerald has bought some

things for Linda,—shoes and some dresses, some toys and a snow suit. . . . Every time Gerald was in town he came to visit Linda and we never objected. Gerald always asked when to bring her back and we would tell him. He never would have her all night because Linda wouldn't stay.''

The Grahams offered no evidence proving or tending to prove the allegation in their counterclaim that at the time of the entry of the divorce decree, or at any other time, Gerald agreed with them that they might continue to have the custody of Linda.

■    We believe the proofs show that the Grahams are good people and have given Linda the best of care, considering their station in life. We also believe the proofs show that Gerald and his present wife are good people, that Gerald is a fit and proper person to have such custody, and that if given the opportunity he will give Linda as good a home as he is able to, considering his station in life. It will be noted from the prayer of their counterclaim by asking only for alternative relief, the Grahams were apparently willing to permit Virginia to have the custody of Linda. The fact that the Grahams permitted Virginia and Anderson to stay in their home for about ten days during the Christmas period of 1947, in the presence of Linda, does not make a good impression. Nor does the fact that Gerald now lives in a trailer make a favorable impression. However, it is a matter of general knowledge that because of the housing shortage many worthy married people are temporarily forced to live in trailers with their families, and the uncontradicted proofs show that Gerald will soon be able to occupy a suitable home.

■    The principal and controlling issue is whether the Grahams or Gerald should have the custody of the child, considering the best interests of the child and considering the relative rights of the respective parties.

In *Stafford v. Stafford,* 299 Ill. 438, 448, the court said: ''Under the evidence in the record defendant in error is entitled to the custody, care, control and education of his son as against plaintiff in error (who was his deceased wife's sister). He is its father and has the natural right to have such custody. As against him the plaintiff in error has no right whatever, under the law, to the custody of the child, no more than an absolute stranger, unless it can be shown that he has in some way forfeited his right. . . . As father of the child he has the right to its custody as against the world, because there is no showing that he has forfeited such natural right.'' In *Cormack v. Marshall,* 211 Ill. 519, the court said: ''We regard the rights of the parent as superior to those of any other person, when that parent is a fit person to have the custody of children and is so circumstanced that he can provide the necessaries of life and administer to the requirements of such a charge. The mere fact that some other person may have more money or property in any form is not one that appeals to us. . . . And while it is said in the books that the interests of the child is the controlling question, it is not meant thereby to say that the financial interests, only, of the child shall predominate.''

The question then is, has Gerald by his past conduct forfeited his natural right to the custody of the child?

The divorce decree gave Virginia the custody of the child until the further order of the court, and she continued to have such legal custody until the order appealed from was entered, although the child in fact continued to stay with the grandparents. Shortly after learning of Anderson's stay at the Graham home Gerald filed his present motion, and we believe he was fully justified in so doing.

After a careful consideration of the evidence, and a careful consideration of the best interests of Linda, it is our opinion that Gerald has not forfeited

his natural right to have the custody of his child Linda and that he is entitled to such custody, and it is therefore our opinion that the trial court erred in entering the order appealed from.

Such order of the trial court is therefore reversed and the cause is remanded to the trial court with directions to such court to grant the care, custody, control and education of such child to Gerald Liles until the further order of the court.

*Reversed and remanded with directions.*