Vivian M. Wade (Now Vivian M. Shures), Plaintiff-Appellant, v. Robert G. Wade, Defendant-Appellee.

Gen. No. 10,558.

Opinion filed December 5, 1951.
Released for publication December 26, 1951.

MILLER, LEACH & ARMSTRONG, of Decatur, and Mc-
NEILLY & RYAN, of Peru, for appellant.

MELVIN FINER, of Mt. Carroll, for appellee.

Mr. Justice Anderson delivered the opinion of the court.

The plaintiff-appellant, Vivian M. Shures, formerly Vivian M. Wade, and the defendant, Robert G. Wade, were married in 1942 and lived together as husband and wife at Savanna, Illinois, until February 1945. Two children were born as issue of this marriage, Roger Wade, born May 22, 1943, and Sharon Wade, born July 23, 1944. In February 1945, the parties separated. The wife took the son, Roger, to Decatur, where she has resided continuously since that time. She obtained employment as a waitress in Decatur, and left the daughter, Sharon, with her father, Robert G. Wade, the defendant. After the separation, he took Sharon to his parents' home in Decatur, where she lived until the divorce was obtained.

In October 1945, the parties had some conversation about a divorce. It appears from the record that probably both parties wished to remarry. Wade told his wife that he wanted to marry another woman, and it was agreed between the parties, in the event the divorce was obtained, that the plaintiff would have custody of their son, Roger, and the defendant of their daughter, Sharon. On October 29, 1945, the plaintiff procured a divorce from the defendant in the circuit court of Carroll county. The decree provided that the plaintiff should have permanent care, custody, control, and education of their son, Roger, and the defendant have the permanent care, custody, control, and education of their daughter, Sharon. There is no other provision in the decree concerning the two children. Within two months after the divorce the defendant remarried, and Sharon, who prior to that time had been living with the defendant's parents in Decatur, came to Savanna, Illinois, and lived with the defendant and his second wife until the fall of 1947, at which time the defendant and his second wife separated. The defend-

ant again took Sharon to Decatur to the home of his parents to reside. The defendant continued to live in Savanna until 1949. It appears that in January 1948, the defendant's parents, due to illness and other reasons, did not care to keep Sharon any longer. At that time Bruce Smith, cousin of the defendant, and his wife, Doris, asked him for permission to take Sharon to live with them in Des Moines, Iowa. Defendant gave them this permission, and Sharon was taken by the Smiths. Since that time she has resided in their home in Des Moines, and they now have her physical custody. There is no contention made by anyone that Sharon, during the time she was with the defendant, his parents, and the Smiths, has not received excellent care.

The record discloses that since Sharon was six months old, her mother has seen her but twice. On July 3, 1948, the plaintiff was married to Richard Shures. Subsequent to this marriage, with the consent of the defendant, the son, Roger, was adopted by Mr. and Mrs. Shures. On June 15, 1951, the plaintiff was served with notice that the Smiths had instituted adoption proceedings in Polk County, Iowa, to adopt Sharon. Immediately thereafter plaintiff filed in the circuit court of Carroll county a petition for a rule to show cause, and a petition for modification of the divorce decree. The petition for rule to show cause avers in substance that the defendant has, without the consent of the court and without notifying plaintiff, removed Sharon from the jurisdiction of the court, and asked that for so doing, defendant be held in contempt of court. The other petition for modification of the divorce decree alleges, in substance, that petitioner be granted the custody of her daugher, Sharon; that she has adequate financial means to care for Sharon; that the defendant is an unfit person to have her custody, because he took her from the jurisdiction of the court, abandoned her, left her in the custody of strangers, and

consented to her adoption by the Smiths. The petition then requests that plaintiff-petitioner be awarded the care, custody, control, and education of Sharon.

After evidence was taken on these two petitions, the chancellor denied both petitions, and the plaintiff has appealed to this court. At the hearing Robert G. Wade, defendant, testified and was examined by the plaintiff's attorney under section 60 of the Practice Act, Ill. Rev. Stat. 1951, chap. 110, par. 184 [Jones Ill. Stats. Ann. 104.060]. He testified that he now resides with his parents in Decatur, Illinois; that he is a musician, and also works for his father, who is a painting contractor; that ''he contacted his former wife with regard to visitation of this child,'' prior to their divorce. He further testified that ''he went back and got the child for her to see''; that after the divorce he never had any conversation with plaintiff concerning her visitations of the child; that the child stayed with defendant's parents through 1947 until the latter part of January 1948. At that time Sharon went to live with his cousin, Bruce Smith, and his wife, Doris. The defendant was then living in Savanna. The child was permitted to go to Iowa because defendant's parents could no longer look after her due to illness. He testified that within a month after the child was taken to Iowa he told the plaintiff's mother that the child was in Des Moines, and who she was with; that he had never asked the court for permission to take the child out of the State; that he subsequently consented to the adoption of the child by the Smiths, who provide a wonderful home for her, with the understanding that the child should know who was her father and he would have a right to visit her; that he could not take care of her and was satisfied with the arrangements that the Smiths have her custody; that he sees the child every summer and holidays, when the Smiths have brought her to Decatur; that he has never informed the

plaintiff when the child was in Decatur; that about the time his wife applied for a divorce he asked her what she wanted to do about the children. She said he could take Sharon and she would take Roger. He has had the custody of Sharon since she was six months old and is in a position physically and financially to provide a home for the child at this time. While he is working his parents will take care of her. He further testified that Sharon has been with the Smiths in Des Moines, Iowa, since January 1948, and to his knowledge the mother never asked to have the child brought back from Iowa. She had visited the child once at his home in Decatur where both parents then and now reside. Each party knew where the other lived. In 1949 he told the plaintiff that the Smiths wanted to adopt Sharon. The plaintiff told him that she wanted her custody. In 1951 the Smiths filed a petition to adopt Sharon.

He further testified, being recalled under the provisions of section 60 of the Practice Act, *supra,* "Q. Mr. Wade, in the event the Court denies this petition, the child will continue to live with the Smiths, is that correct? A. Not necessarily. No. Q. What do you mean? A. I can take care of her. Q. If the court denies this petition, will the conditions remain as in the past; will she continue to live with the Smiths in Iowa during the school year? A. I would rather have her with me. Q. She has been with the Smiths for three or four years? A. Yes. Q. In school? A. Yes. Q. Would you continue to leave her there? A. It is hard to say; it is for her welfare, if she would be better over there with them, that is why I signed the petition for adoption, her welfare. Q. Have you felt the best interest of the child is served by leaving her with the Smiths? A. I do."

Vivian M. Shures, plaintiff, testified in part as follows: At the time the divorce was granted she earned $25 a week as a waitress in a tavern. She took the boy

but did not take Sharon because she could not take care of two children. Her husband informed her prior to his second marriage that Sharon was going to live with him and his second wife in Savanna. After the divorce was granted, plaintiff testified, she continued to work in Decatur until the last two years; that prior to her remarriage in 1948, she had all she could do to look after the boy, her son, and herself, but now she has an adequate home, and is seeking Sharon's custody. She had never been contacted by the defendant concerning the whereabouts of Sharon, did not know that she was in Iowa until last fall, but thought she was in Chicago. As soon as she found out where the child was, she filed the petition for her custody. About two years ago the defendant called the plaintiff and asked her to consent to the adoption of the child by the Smiths. Plaintiff said that she refused and knew nothing of the adoption proceedings until June 15, 1951. She knew the child was with the Smiths, but did not know where, and did not know she was with them until her husband called her about the adoption proceedings. Since the divorce was granted, plaintiff testified, she saw the child once when plaintiff was working in a drug store in Decatur, and once at her mother's home in Decatur. She had sent the child two birthday gifts which she had given to the defendant's mother to include in a box. The defendant's mother had informed her the child was in Chicago. The child was six months old at the time of the divorce. She had been separated from Wade one year before the divorce. Before the divorce was granted she had telephoned the defendant's mother and told her she wanted the custody of the daughter, but she understood at the time the decree was granted that her husband was to have her custody. From February 1945, the date of separation, until the divorce, plaintiff never actually knew where the child was, but thought she was in the defendant's mother's home in Decatur.

Richard Shures, husband of the plaintiff, testified that he earns about $70 per week. They own a ranch-type house in Decatur where they reside and he is willing to accept Sharon into his home, pay for her support and education, and treat her as his own child. They have just one other child, Roger Wade, the child of the parties herein.

The first question presented is whether or not the chancellor erred in not finding the defendant to be in contempt of court in permitting Sharon to be taken outside the jurisdiction of the court. The decree, without any limitation or restriction whatsoever, gave the defendant full custody of the daughter, Sharon. In fact plaintiff had consented to this decree. There is no provision in it requiring the physical custody of the child to be kept by the defendant or that the child remain in the State of Illinois. Many occasions might arise whereby a parent who is given custody of the child might permit it to be taken out of the State. It might be that it would be thought necessary to put the child in a boarding school where the parent was unable to look after it. While the physical custody of the child would be in others, the legal custody would still be vested in the parent who obtained it under the decree of the court. The evidence shows no demand by the plaintiff that the child be brought back into the State, or any petition or request of the court that the decree be modified, permitting visitations. Plaintiff has cited no authority that a parent who removes a child from the jurisdiction of the court given to the parent under a divorce decree which does not provide that the child shall remain in the jurisdiction of the court, should be held in contempt of court for taking the child outside of its jurisdiction. There is no provision in this decree that the child remain in the jurisdiction of the court, such as was included in the decree in *Martinec v. Sharapata,* 328 Ill. App. 339 (cited by appellant). It is

true our courts have stated that it is against the policy of our laws to permit children to be taken outside of the jurisdiction of the court where their custody has been given to one parent under a divorce decree, the reason being that in doing this the court is prevented from carrying out the mandates of its decrees. So the court might be prevented from entering orders as to change of custody, if the parent and child or the child has been removed from the jurisdiction of the court, and the parties aggrieved might be deprived of substantial rights with reference to custody and visitations of the children. (*Smith v. Smith*, 101 Ill. App. 187; *Chase v. Chase*, 70 Ill. App. 572.) Here the father, who has the legal custody, is still a citizen of this State and can be reached with process.

A petition for contempt of court is quasi-criminal in nature, empowering a court of chancery to punish a person who violates a decree of the court. The doctrine is discussed in *Mesirow v. Mesirow*, 346 Ill. 219. At page 222 the court says: "A court of chancery has power to enforce its decree for alimony by attachment for contempt, and the commitment of the defendant for contempt for failing to comply with the decree is not an imprisonment for debt from which he can claim exemption under the provision of the constitution which has been mentioned and which is found in the same language in the constitutions of 1818 and 1848. (*Wightman vs. Wightman*, 45 Ill. 167; *O'Callaghan vs. O'Callaghan*, 69 id. 552; *Blake vs. People*, 80 id. 11; *Barclay vs. Barclay*, 184 id. 375; *Welty vs. Welty*, 195 id. 335.) It is also held in these cases that the power to enforce the payment of alimony by imprisonment of the defendant for contempt of the court is limited to a willful and contumacious refusal to obey the order of the court, and to such refusal the constitutional limitations has no application."

There is no evidence in this record that the defendant willfully violated any provisions of the

178

decree in this cause, and the chancellor so found by his order denying the petition for citation, and it is our opinion that his order was correct.

The most serious question involved in this proceedings is whether the custody of Sharon should be taken from her father and given to her mother. The petition asking for change of custody is based upon the provisions of Ill. Rev. Stat. 1951, chap. 40, par. 19 [Jones Ill. Stats. Ann. 109.186], which provides: ". . . When a divorce shall be decreed, the court may make such order touching the alimony and maintenance of the wife or husband, the care, custody and support of the children, or any of them as, from the circumstances of the parties and the nature of the case, shall be fit, reasonable and just. . . . The court may, on application, from time to time, make such alterations in the allowance of alimony and maintenance, and the care, custody and support of the children, as shall appear reasonable and proper."

■ ■ A decree fixing the custody of children is final and *res adjudicata* and should not be altered or amended unless new facts have arisen since the entry of the decree that make it necessary for the *welfare of the child* that the custody be changed. (*Thomas v. Thomas*, 233 Ill. App. 488; *Maupin v. Maupin*, 339 Ill. App. 484; *Liles v. Liles*, 336 Ill. App. 159.) The welfare of the child is pre-eminently the thing to be considered. (*Martinec v. Sharapata, supra.*)

■ In *Maupin v. Maupin, supra,* Mary Lee Maupin obtained a divorce by default against her husband, William H. Maupin, on the grounds of desertion. The decree awarded the custody of the two minor children, aged three and two, to the defendant father. Several months later the mother filed a petition for modification of the decree, and asked that she be given custody of both children. The mother testified at this hearing that at the time the divorce was obtained, she was ill, and all she was thinking about was the obtaining of a

179

divorce. Since then she has regained her health and obtained a job. There was no evidence that the mother was not a good woman, and would not properly look after the children. On a hearing the court awarded the custody of the child, Marilyn, to the mother, and William to the father. The father appealed from this order. The court says on page 488 of the opinion:

" 'A decree fixing the custody of a child is final on the conditions then existing and should not be changed afterwards, unless on altered conditions since the decree, or on material facts existing at the time of the decree, but unknown to the court, and then only for the welfare of the child.'

"We call particular attention to the last phrase in the above-stated rule. It should be plain, in any case, that the mere fact there has been a change in conditions is not sufficient in itself to modify a decree, unless those changed conditions affect *the welfare of the child*. As stated by another chancery court: 'But the changing circumstances must be, obviously, those that affect the children,—not those that concern the parents.' *Dixon vs. Dixon,* 76 N. J. Eq. 364, 367, 74 Atl. 995. Another court has said: 'In determining whether there have been changed conditions the court must keep in view primarily the welfare of the child. The custody of the child is not awarded for the purpose of gratifying the feelings of either parent or with any idea of punishing or rewarding either parent.' *Hamilton vs. Anderson,* 176 Ark. 76, 2 S. W. (2d) 673."

The court again says on page 492 of the above opinion: "It is the policy of courts of review to recognize a broad discretion in a chancellor called upon to award custody of children, and perhaps even greater discretion is allowed in altering visitation privileges. But this policy cannot properly admit that a definite award of custody has no permanence or finality what-

180

ever. Changes in permanent custody (as distinguished from visitation privileges) should not be subject either to constant or spasmodic variation, merely to follow fluctuations in the health, employment, or residence of the party last deprived of custody, where the order was not conditional with respect to such changes.

"(9) Accordingly, we hold that, if a divorce decree award custody unconditionally, a mere showing of change in conditions of the person deprived of custody is not sufficient to set aside or drastically modify such decree, in the absence of proof that the welfare of the children requires such a change.

"(10) We find nothing in the record now before us indicating that the welfare of the children required any change in the custody decree. The chancellor did not make any finding to that effect, but on the contrary, announced from the bench that the children had been receiving very good care. The report of the probation officer, even if properly received and considered, does not appear to have presented anything to alter the chancellor's original opinion." The court reversed the order of the chancellor, and held that the custody of the two children should have been permitted to remain with the father as provided in the original decree.

██ ██ So applying the above rules of law to the facts here, it appears that the plaintiff at the time the divorce decree was obtained in 1945 fully understood and agreed that the custody of Sharon would be awarded to the father. It appears from the evidence that the child, since it was six months old, has been in the legal custody of the father, although its physical custody has been with the Smiths for the last two or three years. The mother during all this time has shown no interest whatever in her child. In fact it seems unnatural that she would have left her husband without taking the child, Sharon, six months after its birth, and

thereafter for many years make no inquiry about her. The child is now more than seven years old and her mother is a complete stranger to her. The evidence discloses that the child is being reared properly in a fine home, and there is nothing the matter with the character of either the father or the Smiths that would in any way militate against the child having the tender care and consideration it should have. The paramount question is what is best for the interests of the child. The fact that the mother has now a good home and is a good woman does not give her the right to have the custody of her daughter, unless the welfare of the child requires it. (*Maupin v. Maupin, supra.*)

The chancellor did not find nor was [he] asked to find whether or not the child should be returned to the jurisdiction of the court. The fact that the mother now wants the child because she is able to provide it a home and properly rear it is only of secondary importance. The child, in the many years intervening, has been loved and care for by others, and it seems rather poor grace for the mother, after these many years, without in any way attempting to see her child or filing any petition with the court to have rights of visitation, after this length of time should ask that she be given complete custody of her. It is true that she should not be punished for her neglect of her duty to the child, and she should not be penalized for this alone. The chancellor, however, did have the opportunity to see her on the witness stand and to judge her from her past lack of attention to the child, whether or not it be for the best welfare and interests of the child to now give her its custody. In her petition she only asks for the custody of the child, not that it be brought back to the jurisdiction of the State, if this custody is denied or the court prevent its adoption by the Smiths. The evidence discloses that the father has consented to the adoption petition. This, of course, does not bind plain-

182

tiff, and she still has the right to appear and resist the adoption of the child if the petition is prosecuted. The effect of the order of the chancellor is that her petition for custody be denied. The father testified that while he thought that the adoption proceedings should be permitted, that if they were not permitted or in substance that if the child would be brought back to Decatur, Illinois, that he would provide a good home with his parents where she had formerly resided. His character and fitness to have the custody of Sharon is not questioned except insofar as he permitted the Smiths to petition for the child's adoption.

 If for any reason the plaintiff desires other relief as to rights of visitation, these matters can be adjudged by the chancellor in future proceedings. The chancellor is given broad discretion in awarding custody of children in divorce matters. He has an opportunity to see the witnesses, test their credibility or want of credibility, and courts of review should not reverse his findings for these reasons unless they are clearly against the manifest weight of the evidence.

Considering the entire record in this case, it is our opinion that the chancellor was correct in refusing to modify the divorce decree and give the custody of Sharon Wade to the mother. The mother contends that she did not know where the child was during a great part of the period from the time the child was six months old until the time the petition was filed. We think that the evidence conclusively shows that she did know or could have ascertained with very little effort where the child was. After a careful analysis of all the testimony in the record and after these many years, we do not believe that the welfare of the child requires a change of custody.

For the above reasons, after a careful reading of the entire record and the briefs of counsel, it is our considered opinion that the chancellor was correct in his

two orders finding that the defendant was not in contempt of court, and that the custody of Sharon Wade should remain with her father.

*Orders affirmed.*