MELTON ET UX. *v.* CONNOLLY

[No. 145, September Term, 1958.]

*Decided February 18, 1959.*

The cause was argued before HENDERSON, HAMMOND, PRESCOTT and HORNEY, JJ.

*J. Lee Smith* for the appellants.

*Sidney Blum,* with whom were *Jacob Blum* and *Charles Yumkas* on the brief, for the appellee.

HAMMOND, J., delivered the opinion of the Court.

Foster parents are appealing from an order giving custody of a five-year-old girl who had been in their home for four-and-a-half years to her father.

The father and mother of the little girl, Stephanie, married in 1952, after they had lived together for four years, and had two other children, one born in 1949, the other in 1951. Stephanie was born in July, 1953. In 1955 the mother sued for divorce and, although she was denied relief, was, in 1957, officially given custody of the children, two of whom had been with her for several years (Stephanie was with the foster parents). Several months later she committed suicide.

In 1953 when Stephanie was four months old, the mother had to enter a tuberculosis sanitarium. A few days before she was to go in, she insisted that her sister Mrs. Clifford Melton take Stephanie while she was in the sanitarium, a request in which the father joined. The child has been with the Meltons ever since. Mr. and Mrs. Melton have been married twenty-four years and have two children of their own, a married daughter and a teen-age son who lives with them. Their home, in an outlying section of Baltimore, is conceded to be attractively and comfortably furnished and to be clean and well-cared for. Stephanie is loved and treated as their own child and she knows and loves Mr. and Mrs. Melton as her father and mother and her cousin as her brother. She has known no other father and mother. Mr. Melton refused advantageous employment out of town because under the court's restrictions the little girl could not leave Baltimore.

Stephanie is a healthy, happy, normal and well-adjusted child. Mrs. Melton is a Roman Catholic and Stephanie was baptized in that faith and attends church regularly. She has her own room in the Melton household. She sees her father from time to time and likes to play with her brother and sister.

The father, if given her custody, intends to take Stephanie to live at his mother's house in the Walbrook area. The house was described by the probation officer as "miserably dirty, both inside and outside. The stench of dogs which permeates the house is overwhelming. It is difficult to see how the present occupants of the home can tolerate such a situation." There are indications in the record that neighbors not only fully agree with the conclusions quoted but feel that the standards of the occupants of the house are no higher than its physical state. It was in this house that the father and mother stayed much of the time they were living together before they were married, with his mother, Stephanie's grandmother. Now living in the house are the grandmother, the father, his son by a prior marriage (which ended in divorce), his sister and her son (she is separated or divorced), and Stephanie's siblings whose custody recently was given to the father, and as to whom no appeal was taken.

It may be said without unfairness that the record discloses the father to be a generally well-meaning but an unstable and weak man who is far more prone than the average to misfortune and ineptness. His ethical and moral standards must be rated below par. Neither he nor the grandmother have had any religious affiliation for years, and none of the children in their household receive religious training. The grandmother, who has been divorced for over twenty years, is sixty-five years old and has undergone serious operations. She could take Stephanie only if a servant were provided and needs one even though Stephanie should not join the family. The father has promised to provide a servant but has yet not done so.

The evidence was somewhat conflicting as to the intensity and genuineness of the father's desire to have his children, particularly Stephanie. He claims to have always wanted them. Under court order he paid his wife, with fair regularity, $17.50 a week while she had custody. None of this

went to the Meltons, who had Stephanie. On the other hand, there was evidence that, while their mother was alive, he sought custody only to hurt her and that he has never shown any real desire for the children.

The chancellor did not decide the case immediately after the hearing ended, but waited for a report from a child psychiatrist, and seems to have based his decision and decree largely on the recommendations of that report. The psychiatrist said: "The more I postponed my report to you, the more difficult it became to make an unequivocal recommendation"; and continued, speaking of the grandmother's home: "I feel it might be worth while to check and find out whether or not the conditions described formerly by neighbors and others still prevail." His conclusion was: "[I]t is extremely difficult for me to see how psychiatry or the law could justify a decision that would keep the child permanently away from her father and her siblings." He recommended a year of transition during which Stephanie would stay with the Meltons and "gradually be helped to transfer her feeling of belonging in order to make the transition less abrupt and more readily acceptable to the child."

The chancellor's decree embodied the year transition period in awarding custody to the father.

As we said in the custody case of *Butler v. Perry,* 210 Md. 332, 339, 340, the determination of the proper custody for the child usually does not turn on credibility or findings of .fact, and "Under such circumstances we feel that we must exercise our best judgment in determining whether the conclusion the chancellor reached was the best one"—best, that is, for the welfare, benefit and interest of the little girl. Normally a parent is to be preferred to others in determining custody, largely because the affection of a parent for a child is as strong and potent as any that springs from human relations and leads to desire and efforts to care properly for and raise the child, which are greater than another would be likely to display. Nevertheless, in every case, the best interests of the child are paramount, or, as this Court put it in *Dietrich v. Anderson,* 185 Md. 103, 116: "* * * the welfare of the child is the consideration of transcendent importance, and this

holds true even when it means denial of the custody to the parents, or either of them." Another guide in these cases is the length of time the child has been away from the parent. If reclamation is sought soon after custody has been given another and the parent is not clearly unfit, the Court will recognize the strength of the parental feelings and the sincerity of the desire to do the best for the child and return the infant. If, however, reclamation is not sought until after the lapse of years, and until after ties have been formed and direction been given the child's life and thought, the possible harm or benefit to the child in a change must be carefully weighed, for "It is an obvious fact, that ties of blood weaken, and ties of companionship strengthen, by lapse of time; and the prosperity and welfare of the child depend on the number and strength of these ties, as well as on the ability to do all which the promptings of these ties compel." *Dietrich v. Anderson, supra,* at page 119.

The ties between Stephanie and the Meltons are numerous and strong, and they have the ability to do that which the promptings of the ties compel. The contrast between Stephanie's present environment and that to which she would be moved under the chancellor's decree, is striking, both as to tangibles and intangibles. The grandmother's home, physically, and in atmosphere and influence on the growth and training of the child, would seem to be inadequate if not harmful. The change, we think, could only result in detriment to the child. The psychiatrist recognized and feared the emotional upset that an abrupt change would cause. We are not persuaded that the gradual change would be much better—indeed, the stress and wear of almost inevitable conflicts of loyalty and desire might be worse. In *Trenton v. Christ,* 216 Md. 418, 423, we would not transfer a ten-year-old girl from her maternal grandparents to her father, in large degree because of the emotional upset the change would involve. For other cases which have found that the best interests of the child lay in staying with a foster parent with whom the child had long been rather than in being moved to a natural parent, see *Ross v. Pick,* 199 Md. 341, and *Pio-*

*trowski v. State,* 179 Md. 377. We think the Meltons have shown that they should continue to have Stephanie.

We are not unaware that we have recognized that in most cases a child should be raised with his or her brothers and sisters, but we think the other factors and circumstances of this case must overbalance that *desideratum.* A revised decree should make sure that Stephanie, while living with and remaining in the custody of the Meltons, should see and get to know well her siblings and her father. The affection that both the father and the Meltons profess for Stephanie should, once the custody question is settled, make them work in cooperation to achieve a harmonious relationship between the two families and Stephanie for, if they do not, Stephanie is the one who will be hurt.

> *Decree reversed, with costs, and case remanded for further proceedings not inconsistent herewith.*