WINTER *v.* CROWLEY, Jr.

[No. 186, September Term, 1962.]

324

*Decided April 16, 1963.*

The cause was argued before BRUNE, C. J., and HAMMOND, PRESCOTT, HORNEY and MARBURY, JJ.

*Ferdinand J. Mack,* with whom were *Arthur J. Hilland* and *James E. Hogan* on the brief, for appellant.

*Elizabeth H. Allen* for appellee.

BRUNE, C. J., delivered the opinion of the Court.

This custody case is a sequel to a divorce case. On March 21, 1961, the appellee, Stephen B. Crowley, Jr., was awarded a divorce a vinculo matrimonii from the appellant, then Anne Marie Crowley, on the ground of her adultery, and by the same order he was awarded custody of their four children. The pres-

ent proceedings were initiated by a petition filed on February 13, 1962, by the appellant to modify the decree of March 21, 1961, by awarding the custody of the children to her. The Circuit Court denied her petition for custody, but modified its previous order with regard to the appellant's rights of visitation by making the times and conditions more definite (and also more liberal than what the appellee had been according under the original order). The appellant, who has remarried since the divorce and is now Anne Marie Winter, appeals from the denial of her petition for changing the custody of the children from her former husband to herself.

The trial of this case extended over about two and a half days, and quite full testimony was adduced by each side, with the sharply differing views that are not uncommon in such cases. The mother, as we shall refer to the appellant, offered testimony to show that since her remarriage she was leading an entirely proper life and was a good housekeeper and that she and her present husband were taking good care of two young children of a friend of the mother who were living with them as foster children. A number of persons testified that in their opinion the mother was a fit person to have custody of her four children, whose custody is here at issue. Her new husband, Mr. Winter (who was in no way involved in the appellant's divorce case), was described as being fond of children, as getting on well with them, and as maintaining a firm, but in no way harsh discipline. He had previously been married and had seven children of his own, all of whom lived with their mother, who had obtained a divorce on the ground of desertion. He was 'on friendly terms with all of these children, and apparently there was no bitterness between him and his ex-wife. The house in which the Winters live contains four bedrooms. It was proposed that the two foster children, the four Crowley children and the two adult Winters all continue to live there, and it was asserted that the house would be adequate without change for the entire group for several years. Because of a hysterectomy (performed before the divorce) the mother can have no more children.

Since the divorce of the parties in March, 1961, the father and the children at first continued to live in the former matri-

monial home, and the mother moved out. Soon afterwards, acting on the advice of her counsel, she moved back, and the husband and children then moved out. For a time they stayed with his first cousin and her husband and their three children. Then as the new school year was about to open, they moved for a short time to the home of the father's mother. Meanwhile, the father's mother was having a new house containing four bedrooms and two bathrooms built for the father and the four children on a one-acre lot separated from her house by a vacant lot of roughly the same size, the three properties together amounting to about three acres. All of them are owned by the father's mother.

A few months after the divorce the father had a mental breakdown and made some attempt at suicide. He was suffering from extreme depression. The depression and breakdown were, according to expert medical testimony, caused by the father's marital difficulties and the break-up of the home. After a brief period of hospitalization and psychiatric treatment he was discharged from the hospital, but continued treatments, including in all over twenty shock treatments, which were gradually diminished. By the time of the trial they had ended, but he was continuing group therapy treatments. The prognosis for his complete mental recovery was good. He was unable to work for some months after his breakdown and was supported by his mother. Just before Easter, 1962, he had gone back to work for a week in his appliance service business, but had injured his leg while hiding Easter eggs for the children and had had to have an operation to remove a cartilage.

At about the time when the trial of this case started, the father became engaged to a young woman whom he had met about two months earlier, and they were to be married a few days after the trial. The prospective Mrs. Crowley testified that she was very fond of the Crowley children, that they were fond of her and that they wanted her and their father to marry, and that she would be glad to have the children live with them if they wanted to do so, but not against their wishes. She also expressed a desire for children of her own.

The evidence indicated that at times the father had used foul language in referring to the mother in the presence of the chil-

dren and that on one occasion he had spanked one child quite hard. There was also testimony to the effect that he had made the mother's exercise of her rights of visitation very difficult and that he had restricted them quite narrowly. There was also testimony the other way indicating that she did not fully use the rights which were accorded and that for some time, to show her disapproval of the circumstances in which the children were living, she did not visit them at all. There was also evidence that the children communicated with her secretly so as not to incur the anger of the father or of his mother and that she encouraged such communications. There was, in addition, evidence indicating that her visits to the children were quite upsetting to them and that she was influencing them against the father.

The testimony included both criticisms and defenses of the care which the children had received since the divorce, and there was conflicting testimony as to which parent the children themselves said they preferred to live with. The record includes extensive psychiatric and psychological reports mainly pertaining to the children, but also reports pertaining specifically to the father's breakdown and treatment. The psychiatrist who treated the father testified fully as a witness on both direct and cross-examination.

Judge Pugh filed an opinion in which he reviewed the major issues and contentions and set forth his findings and conclusions. He said in part:

> "The defendant [mother] testified, and her witnesses corroborate her testimony, that she has changed her way of life since the divorce was granted on March 21, 1961. The defendant also claims that the plaintiff [father] is unfit to have the four children because he has had a nervous breakdown and therefore is unable to properly care for them. The Court is impressed with the effort of the defendant to change her way of life and feels that she has made real progress in readjusting herself. She appears to be happy and contented with her present husband. On the other hand, the Court cannot say that the evidence in this case establishes that the plaintiff is unfit to have the children."

He then referred to the cases of *Hild v. Hild*, 221 Md. 349, 157 A. 2d 442, and *Parker v. Parker*, 222 Md. 69, 158 A. 2d 607, which hold that in a custody case, although there is no inflexible rule, "[u]sually, the fact that the mother has been guilty of adultery will be taken as indicating that she is not a proper person to have custody, and a strong showing must be made to overcome the usual rule or presumption against awarding custody to an adulterous mother." See *Parker v. Parker, supra* (222 Md. at 75). He also referred to *Bray v. Bray*, 225 Md. 476, 171 A. 2d 500. In that case, this Court, speaking through Judge Prescott, summarized the law of this State on this subject and said in part (225 Md. at 483): "And the mother, who has been shown to have committed adultery and who claims to have mended her ways and to be a fit and proper person to raise a child, must make 'a strong showing' to overcome the usual rule against awarding custody to an adulterous mother * * *."

After citing the *Bray* case, Judge Pugh went on to say:
"The defendant has only herself to blame. It was her actions which caused the divorce and the loss of custody of her children. She now claims to have changed her way of life. The Court, as heretofore stated, believes she has changed her way of life. The fact that she has changed her way of life, however, does not of itself, entitle her to the custody of the children. She has not made a strong showing that the plaintiff is unfit for the custody of the children. The evidence shows that the plaintiff has had a nervous breakdown and was hospitalized. This condition, in the opinion of a reputable psychiatrist, was caused by the wife's adulteries and the breaking up of the home by the wife. The plaintiff appears to be on the way to complete recovery. He is impressive as a witness in his own behalf. Testimony offered by him shows that he is a good father and in all respects a fit and proper person for the children."

His conclusions were that
"the court finds from all of the evidence (1) that the

plaintiff is a fit and proper person to continue with the custody of the four children, (2) that the defendant has failed to make a strong enough showing to overcome the usual rule that an adulterous wife is not a fit person to have the care and custody of the children, and (3) that it would be for the best interest and welfare of the children to continue in the custody of the plaintiff-father."

Reading together the passages which we have quoted, we think that Judge Pugh's decision was founded on the three findings just quoted. The appellant seeks to make much of his earlier statement that "[s]he has not made a strong showing that the plaintiff is unfit for the custody of the children." She claims that the trial judge thereby injected a new and unsupportable rule into custody cases. We do not think that this necessarily follows. Certainly such a rule would run counter at least to the implication of what we said in *Hild v. Hild, supra* (221 Md. at 360) : "However, this *presumption runs only to the question of the fitness of the guilty spouse*. It does not constitute an absolute bar *nor does it establish the desirability of the innocent party."* (Italics supplied.) Judge Pugh, as we read his opinion, did not apply, nor do we think he intended to state, any rule that the adulterous mother must make "a strong showing" that the father is unfit to have custody. His actual finding on this question was not the negative finding that the mother had failed to meet a heavy burden of proof, but was the positive finding that the father was "a good father and in all respects a fit and proper person." This was in substance repeated in the court's first finding stated in the conclusions.

Our review of the evidence in this case leads us to conclude that the Chancellor's finding of fact that the father was a fit person to have custody of the children is not to be disturbed by us. That could be done only if we were to hold that this finding was clearly erroneous, and we cannot say that it was. Maryland Rule 886 a.

His second finding—that the mother had not made a strong enough showing of having mended her ways to overcome the presumption against awarding the custody of a child to a mother

who has been guilty of adultery—is more debatable. The length of time that her reformation had continued is far less than that in *Wood v. Wood,* 227 Md. 112, 175 A. 2d 573, but her showing of fitness is certainly very much better than that of the adulterous wife who unsuccessfully sought custody in *Mason v. Mason,* 228 Md. 387, 179 A. 2d 897. Here, too, though less clearly than in the case of the first finding, we think it would be difficult to hold that the finding of the Chancellor is clearly erroneous; but we think it unnecessary to decide this question.

Even if we were to assume, however, that the second finding were clearly erroneous and that the mother has made a strong enough showing of a change of ways to overcome the presumption arising from her adultery, we think that the Chancellor's third and determinative finding that it is to the best interests of the children to remain in the custody of the father is not to be disturbed on the evidence in the case. In *Pangle v. Pangle,* 134 Md. 166, 106 A. 337, and in *Townsend v. Townsend,* 205 Md. 591, 109 A. 2d 765, it was held that in a case such as this it required very strong evidence of the propriety and wisdom of such a course to justify transferring the custody of a child from the father to whom it had been awarded to the mother who had been guilty of adultery.

To the reasoning of the cases just cited which puts the emphasis mainly on the mother's past dereliction, we may add that, assuming that the mother here has genuinely reformed, we think that a change of custody is not desirable unless there is some strong reason for it. These children have gone through the very disturbing experience of the separation of their parents and of their own separation from one parent. To repeat the latter process by separation from the parent who now has their custody and is fit to have it, without some clearly apparent benefit to the children to be gained thereby would, in our opinion, be definitely contrary to their best interests. It is true that this Court has often held that ordinarily the welfare of a young child will be best served by awarding custody to the mother, and it has held that this factor is one to be considered in connection with a change of custody from the father. See *Alden v. Alden,* 226 Md. 622, 174 A. 2d 793. There the divorced mother had had a severe mental illness and during the period thereof

and of convalescence the father had had custody of the five-year-old child. That was not a case in which the mother had been guilty of adultery. The trial court found that she had completely recovered from her mental illness, that she had a good home to which to take the child and a good position. The husband was about to (and did) marry again and move to another state. His second wife was a divorcee with two children. The Chancellor awarded custody of the child to the mother and this court affirmed his order.

In the instant case, the Chancellor's finding is explicit that it is to the best interests of the children to remain with the father. We think that the change in the mother's conduct and circumstances are not sufficient to warrant us in holding the Chancellor's finding to be clearly erroneous. On the contrary, we think that the evidence as a whole supports him. To justify a change in custody, the change in conditions upon which it is based must be one affecting the welfare of the child and not of the parent. 2 *Nelson on Divorce and Annulment* (2nd Ed., 1961 Rev.), § 15.39, pp. 319-20. Such a rule was recognized by this Court in *Pitts v. Pitts,* 181 Md. 182, at 193, 29 A. 2d 300, where, quoting 2 *Schouler on Marriage, Divorce, Separation and Domestic Relations* (6th Ed.), § 1901, it was said: "Custody should usually be changed only where the interest of the child requires a modification, where it appears advisable for the good of the child." In the *Pitts* case a change of custody from the father to the mother was held to be desirable for the child. There was a similar, but converse, situation in *Stimis v. Stimis,* 186 Md. 489, 47 A. 2d 497, where custody was taken from the mother and awarded to the father. See also *Schneider v. Hasson,* 161 Md. 547, 157 A. 739 (transfer of custody from great aunt to mother) and *Wirth v. Wirth,* 192 Md. 21, 63 A. 2d 312. The latter case recognizes the rule that a transfer of custody may be made from the father to the mother if the interests of the child so require, but the issue was not properly before the Court.

For authorities in other states upholding the rule that a change should be made only where shown to be for the best interests of the child, see *Jenks v. Brown* (Ala.), 35 So. 2d 359 (child should not be uprooted by his mother and forced

to make an adjustment with a stepfather with whom he is not well acquainted) : *Stifflemire v. Williamson* (Ala.), 34 So. 2d 685; *Dixon v. Dixon,* 76 N. J. Eq. 364, 74 A. 995; *Wade v. Wade* (Ill. App.), 102 N. E. 2d 356, 362 ("The fact that the mother has now a good home and is a good woman does not give her the right to have the custody of her daughter, unless the welfare of the child requires it.") ; *Jeans v. Jeans* (Mo. App.), 348 S. W. 2d 145 (some change in conditions, but not enough to warrant change in custody).

In accordance with the views above expressed the order appealed from is affirmed.

*Order affirmed; the appellant to pay the costs.*