DAVID LEE POWERS ET AL. *v.* VALERIE McGLOTHIN POWERS HADDEN

[No. 269, September Term, 1975.]

*Decided March 24, 1976.*

The cause was submitted on briefs to ORTH, C. J., and DAVIDSON and LOWE, JJ.

Submitted by *Harry D. Barnes* and *Norman F. Summers* for appellants.

Submitted by *Leonard E. Wilson* for appellee.

LOWE, J., delivered the opinion of the Court. DAVIDSON, J., dissents and filed a dissenting opinion at page 589 *infra.*

On April 21, 1975, in the Circuit Court for Cecil County, Judge J. Albert Roney, Jr. entered an order which awarded custody of a minor child, Stephanie Lee Powers, to her mother, Valerie McGlothin Powers Hadden, appellee. It is from this order that the father, David Lee Powers, the paternal grandfather, Ralph J. Powers, and his wife, Charlotte J. Powers (the paternal stepgrandmother,[1] of Stephanie) have appealed.

The record shows that on August 10, 1968, the mother, then 15 years old, married the father, then also a minor. On March 9, 1969, about one week after the father had joined the Marines, Stephanie Lee Powers was born. Six months later, the mother and the father separated. Stephanie, then six months old, continued to reside with her mother. On December 10, 1971, a month before her divorce, a child was born to the mother, sired by Kenneth Hadden whom she married within a month after her divorce.

The divorce was granted on January 7, 1972 in the Circuit Court for Cecil County by Judge H. Kenneth Mackey who awarded Stephanie's father, David Lee Powers, a divorce on the ground of adultery. The court found that the adulterous mother was not a fit and proper person to care for the child; that because the father was in the military service, he was

---

1. The testimony reveals that Charlotte J. Powers is not the mother, but the stepmother, of David Lee Powers, having married David's father in 1969.

unable to care for the child; and that the award of custody to the mother's parents would be to a large extent an award of custody to the mother herself. Therefore, he awarded custody of Stephanie to her paternal grandparents "subject to further order of this Court, the Court retaining jurisdiction in the premises." Reasonable rights of visitation were reserved for the mother and the maternal grandparents. As noted, on January 29, 1972, the mother (then about 18-1/2 years old) married Kenneth Hadden, the father of her second child, and thereafter lived with him and their son in Norfolk, Virginia.

Less than a year elapsed before the mother filed a petition seeking, among other things, custody of Stephanie Lee Powers. After a hearing on November 13, 1972, Judge Mackey found that the petition was "premature"; however, in reaching that conclusion the court anticipated "the very real possibility" that custody would be restored to the mother "if the mother continues in her present direction." [2] Custody of Stephanie remained with the paternal grandparents. In July, 1973, the mother, her husband and their son moved to Southwick, Massachusetts where they had purchased a home near the naval station at which her husband was assigned as an instructor in the nuclear power program.

--------

**2.** "We do not know what the future holds either for this mother or for this father. We do know that the mother is only 19 now and we do know from the testimony in the first hearing that after approximately a year and a half to two years of marriage she did become quite unfaithful. We hope that this would not happen again, but we think it is too soon to be certain of that. We also note a certain amount of transience as to the present husband of the mother. We think that there is relative stability in the home of the paternal grandparents and that this would be another reason we would not change custody at this time.

. . .

I think we should not foreclose from our mind the very real possibility that eventually this child, if the mother continues in her present direction, is going to go back to the mother, I think this is a very real possibility that we ought to think about. Therefore, we ought not be alienating the child from the mother and neither should the mother alienate the child from the father or from the grandparents. I say this is a very real possibility because I say again, we do not know what the future holds and we will just have to wait and see.

Anyway, as far as the change of custody today is concerned we think it is

On January 22, 1974, the mother again petitioned for custody. The reason is not clear from the record why an answer was not filed by the appellants until December 13th, 1974. On April 21, 1975, after a two day hearing, Judge J. Albert Roney, Jr. transferred custody of Stephanie to the mother. Reasonable visitation rights were reserved to the father and the paternal grandparents. In an opinion filed April 23, 1975, the chancellor found the mother to be a fit and proper person to care for the child, notwithstanding her previous adultery. He quoted at length from *Cornwell v. Cornwell*, 244 Md. 674, 679 concluding that:

> " 'However, the fact that the mother may have committed adultery is not an absolute and inflexible bar to her being awarded custody, for when the adulterous relationship has ceased for a reasonable period of time so as to render it unlikely that it will be revived, and the mother has changed her way of living and has demonstrated that she is a fit and proper person to raise her children in a clean and moral atmosphere, then her past indiscretion may be overlooked in considering the award of custody.' "

After recognizing that:

> "The burden is on the Petitioner here to demonstrate that things have changed in her life and that she is living a proper life and that she's a fit and proper person to raise her children in a clean and moral environment.";

the chancellor found:

> "From what the Court has seen from her in this case, with the witnesses, the Court believes that she

---

premature and we do not find sufficient reason to change the visitation schedule at this time. We think that there is enough of a history of this case today and at a previous hearing that we do not need a social services investigation to determine that. The primary thing that concerns me is the brief period of time that has elapsed since the young lady stopped living in adultery."

has changed her way of life; that she is a fit and proper person at this time to raise her children, and I believe that she can raise them in a healthy and proper environment."

The chancellor addressed in his opinion the most pertinent factors for determining what is in "the best interest of the child." Initially he recognized the trauma for Stephanie of changing homes, after living for three years with her paternal grandparents. He evaluated the effect of this change on the child:

"Now then, you have to consider next whether or not a change at this time would have any traumatic effect on the child. This child is six years old, just started in kindergarten. It's a healthy child; everyone agrees that it adjusts well to situations. It adjusted to a change in homes when it was two and a half years old and was taken from its mother and placed with the grandparents. I have no doubt that the child can adjust readily to a new community. The child is at an age when it can make friends with others of its age. I see no problem as far as adjustment is concerned."

Having dealt with the problem of adjustment and after observing the child as well as hearing witnesses describe her, the chancellor then placed upon the scale an auncel weight that cannot be ignored — the presumption that a child's welfare will best be served in the custody of its natural parents rather than in the custody of others. *Ross v. Pick*, 199 Md. 341, 351; *Barnard v. Godfrey*, 157 Md. 264. In concluding his opinion, the chancellor added:

"Furthermore, I believe that, as stated in the cases, a young child, unless the mother is shown to be unfit as a mother, should be with its mother. I think it is wrong to separate children from their natural parents if it can be demonstrated that the parents are fit and proper persons to have them and raise them.

> In this case, the natural father, who is in the service, is constantly away from home. He cannot take care of this child himself, but the natural mother can.
>
> For these reasons, the Court will sign a decree transferring custody of this child from Mr. and Mrs. Powers to its natural mother, Mrs. Hadden."

In assigning error to the chancellor's award of custody to the child's mother, the appellants do not deny that the child's father cannot care for her, nor do they question the chancellor's analysis from which he concluded that the mother's adultery had been purged and that she is now a fit and proper custodian. They do not concede that the effect of change on Stephanie would be minimal.[3] They simply question whether:

> " . . . sufficient time [has] passed for the court to conclude that the mother has rehabilitated herself."

The misleading simplicity of that question may be answered with equally terse simplicity. The testimony indicated an affirmative answer and the chancellor so concluded as indicated above. There is no specified minimum time period that need lapse as a prerequisite to purge one's meretricious misconduct.

But appellants' arguments go well beyond the apparent

---

3. Appellants' arguments begin:

"It is quite obvious that the Chancellor in arriving at his decision concluded that Appellee had rehabilitated herself from the adultery which had resulted in the original decision that she was unfit to have custody. In concluding this, the Chancellor cited the reasoning set forth in *Cornwell v. Cornwell*, 244 Md. 674. The Chancellor went on to conclude that Appellee is now a fit and proper person to have custody of the child, and that the traumatic affect [sic] of such a change would be minimal. All of the Chancellor's reasoning is set forth in his verbal opinion at the conclusion of the case.

*Although Appellants do not disagree that strongly with the logic utilized by the Chancellor in reaching his conclusions, we submit that there is a basis of judicial error because the Chancellor failed to consider all the various factors that should be considered in a child custody case.*" (Emphasis added).

simplicity of their questions and we will endeavor to meet all of the issues raised whether asked or argued.

## The Best Interest of the Child

In responding to the question raised by this appeal, as in deciding the ultimate question of whose custody will be in the child's best interest, it is all too easy to overemphasize any one of the many criteria to be considered, especially since many of these criteria are in conflict. For example, the "reasonable time" we must wait to determine whether a mother is absolved of misconduct, *Cornwell, supra*, at 679, adds to the length of time the child is away from its parent, which is "another guide in these cases." *Melton v. Connolly*, 219 Md. 184, 189. "It is an obvious fact, that ties of blood weaken, and ties of companionship strengthen, by lapse of time. . . ." *Dietrich v. Anderson*, 185 Md. 103, 119. Consequently, the longer the period of time required for a parent to prove reformation, the less chance he or she has to reclaim a lost child.

Add to that a burden to show a change in the conditions of the custody affecting the child's welfare, *Winter v. Crowley, Jr.*, 231 Md. 323, 331, and it may become all but impossible to reverse the status quo. The presumption that a child's interests are best served in the custody of a natural parent eases the burden on a parent attempting to regain custody of his or her child. It is this presumption upon which the chancellor relied as the determining factor in awarding custody to the mother.

## The Presumption Favoring Parental Custody

The presumption that a parent should have custody of his or her child is not based upon sympathetic concern for the parent nor upon parental *rights*. This presumption is a judicial device which shifts the burden of proof to the non-parent seeking custody and recognizes that the child's best interest is usually served in the custody of its natural parents:

"Where parents claim the custody of a child,

there is a *prima facie* presumption that the child's welfare will be best subserved in the care and custody of its parents rather than in the custody of others, and the burden is then cast upon the parties opposing them to show the contrary." *Ross v. Pick,* 199 Md. 341, 351.

That presumption has been reaffirmed by the Court of Appeals, *McClary v. Follett, Jr.,* 226 Md. 436, 441-442, even when custody has been denied to natural parents. *DeGrange v. Kline,* 254 Md. 240, 242-243; *Trenton v. Christ,* 216 Md. 418, 420; *Piotrowski v. State,* 179 Md. 377, 381.[4]

When custody is denied a natural parent, that denial inevitably results from custodial unfitness amounting to forfeiture, as by failing to support the child, *Dietrich v. Anderson,* 185 Md. 103, 116,

" . . . or where some *exceptional circumstances* render such custody detrimental to the best interests of the child." *Ross v. Pick,* 199 Md. at 351; *Trenton v. Christ,* 216 Md. at 420. (Emphasis added).

### The Exceptional Circumstance

The lone "exceptional circumstance" relied upon in this case to overcome the presumption favoring custody in the natural parents, is the length of the period of separation of parent and child. Appellants also argue that the child has been away from her mother for so long that she will suffer from the move to a new environment and disruption of her three-year relationship with her surrogate parents;[5] however, a long period of separation serves merely to rebut the presumption in favor of parental custody. It does not require that custody *not* be awarded the parent.

---

4. These cases point up the judicial phenomenon that a rule is often most clearly expressed in cases where an exception to it is about to be made.

5. Ironically, that consideration now can be argued against appellants since Stephanie has already moved to her mother's home pursuant to the decision below and would have to be "uprooted" again if we reverse that award made nearly a year ago.

The legal authorities for using a long period of separation to overcome the presumption of parental custody uniformly emphasize that parental custody is preferred.

There is little support for the proposition that a three-year separation is so exceptional a circumstance as to abrogate the parental custody presumption. The voluntary surrender of custody by the natural parent is an additional factor which has been given substantial weight as an element of forfeiture in these cases.

In *Melton v. Connolly*, 219 Md. 184, *the parents surrendered* a four month old child (due to illness of the mother) to the mother's sister and her husband. After the mother's death, the father, who was "unstable . . . weak . . . prone . . . to misfortune and ineptness . . . [with] ethical and moral standards . . . rated below par", *waited four and a half years to reclaim custody,* asking to take the child from an "attractively and comfortably furnished [home] . . . clean and well cared for," to his mother's home which was "miserably dirty both inside and out" and where "[t]he stench of dogs which permeates the house is overwhelming."

Apropos to the case before us, where reclamation was sought persistently throughout the three-year separation, the *Melton* Court said:

> "Another guide in these cases is the length of time the child has been away from the parent. If reclamation is sought soon after custody has been given another and the parent is not clearly unfit, the Court will recognize the strength of the parental feelings and the sincerity of the desire to do the best for the child and return the infant." *Melton,* 219 Md. at 189.

In *Ross v. Pick, supra,* the Court held that *parents who had completely surrendered custody* of an eleven-year-old child *for nearly ten* of the child's eleven years subordinated their rights to the child to the rights of those who performed the parental duties. However, once again, the Court's prefatory language is most significant:

> "Where a child has been left by its parents in the

care and custody of others, but the parents reclaim
it soon afterwards, and the parents are competent
to have its custody, the court gives more weight to
the law of nature, which recognizes the force of
parental affection, than to the probability of
benefit to the child by leaving it where it is, even
the probability of advantages which wealth and
social position might bestow." *Id.* at 351-352.

The child's father in *Dietrich v. Anderson, supra,* made no
protest when his wife *surrendered custody* of their ten
month old child to another, nor when a court proceeding
later established that custody legally, but appeared four
years later "out of a clear sky," against even the mother's
wishes, to attempt to vacate the four-year-old custody
award. The Court of Appeals held that:

"While a father is generally entitled to custody of
his infant child, this right is derived from his duty
to support and maintain it, and may be forfeited or
suspended by his failure to do so." *Id.* at 116.

In *Piotrowski v. State,* 179 Md. 377, the Court of Appeals
continued custody of an eight year old girl in the maternal
grandparents who had kept the child since she was four
months old. The holding in this case is more precedentially
persuasive of the proposition that the time away from the
natural parent should overcome the parental presumption
since it appears to have been the controlling factor in the
court's determination. The father and his wife, whom he
married after the child's mother died during the child's
infancy, were "well behaved, industrious, law abiding
people" as were the grandparents who had custody. Without
expressly so stating, the Court seemed to have decided to
continue custody in the grandparents because it was
doubtful that a change in custody would improve the child's
environment and that, due to the substantial time away
from her father, it was possible that it would be detrimental
to her. That period of time, however, was nearly eight years,
running continuously from infancy to the date of trial. Once

again the *voluntary surrender* of custody was a factor which was also considered by the Court. By quoting previous cases, the Court made it clear, however, that it did not abandon the parental presumption:

> " 'There can be no binding, and very little helpful, precedent found in the decisions of the courts on this subject, because essentially each case must depend upon its peculiar circumstances,' *but courts are bound*, in determining the fate of children, and in fixing the environment which is thereafter to direct the course of their lives, *to recognize the natural right of parents to the custody of their children, and unless convinced that it would be injurious to their welfare, to maintain the relationship which society has always recognized as the one most to be desired."* (Emphasis added). *Id.* at 381.

## Sufficiency of the Record

A supplemental argument presented by appellants is that, because the chancellor had not ordered a social services investigative report, the record was not sufficient for his conclusion or our review. We do not agree. While it is preferable to have such a report in most instances, *Ouellette v. Ouellette,* 246 Md. 604, 608; *Jester v. Jester,* 246 Md. 162, 171; *Shanbarker v. Dalton,* 251 Md. 252, 259; we know of no requirement that such investigation be made.[6] We have at times included a recommendation for such investigation as has the Court of Appeals, when, in a divorce case, we were not provided with sufficient facts to indicate why the chancellor decided custody as he did. *Deckman v. Deckman,* 15 Md. App. 553, 564-565. See also *Krebs v. Krebs,* 255 Md. 264.

In the case at bar there was no dearth of facts. The

---

6. Appellants cite and argue an unreported per curiam opinion which is factually inapposite. We note that unreported cases are not acceptable authority.

testimony was abundant and visual evidence was also introduced. Salaries, present and prospective, were discussed. The homes owned by each of the parties were depicted photographically and plans for the future espoused by appellee. The evidence revealed that both parties were fit and proper custodians. The benefit to Stephanie of the grandparents' maturity was balanced by the presence of a half brother very near her age in the mother's home. (This latter factor is, of course, insufficient inducement in itself to warrant change of environment. *Melton, supra*, 219 Md. at 190). On balance, however, we cannot disagree with the chancellor who seemed to view all other factors as equal and tipped the scales in the mother's favor using the presumption that the child's welfare would best be served by a natural parent. The "burden then cast upon the parties opposing . . . to show the contrary", *Ross v. Pick, supra*, at 351, was not met merely by showing the three years' separation of mother and child.

While we recognize that our review of custody awards is not confined by the "clearly erroneous rule", *Sullivan v. Auslaender*, 12 Md. App. 1, 3-4, neither should we be oblivious to the fact that the chancellor had the opportunity to view each witness's demeanor, hear their expressive intonations, and to judge them — to some degree — on their deportment and attitude while testifying. We, on the contrary, are limited to the printed words of a cold record.

> "Ordinarily the court or judge who has had the parties before him, has the best opportunity to observe their temper, temperament, and demeanor, and so decide what would be for the child's best interest, and unless there is some sound reason to the contrary his findings ought not to be disturbed." *Piotrowski v. State*, 179 Md. at 381.

*Order affirmed.*
*Costs to be paid by appellants.*

*Davidson, J., dissenting:*

In concluding that custody of Stephanie Lee Powers should be transferred from her paternal grandparents to her natural mother, the majority has relied upon a court-made presumption that the child's welfare will best be served in the care and custody of her mother. They maintain that custody may be denied to a natural parent only when such parent is unfit or there are other exceptional circumstances. They conclude that the natural mother here is fit, and that no other exceptional circumstance exists.

I believe that in assessing what constitutes the best interests and welfare of Stephanie Lee Powers, the majority has become involved with concern for a natural mother faced with the possible loss of a child, and has focused on her rights, needs, and conduct rather than on the interests of the child. Such a focus is common in contests between natural parents and custodial parents. For example, custody will be awarded to the natural parents if they have lost custody of their children involuntarily as a result of circumstances beyond their control, on the theory that such parents do not deserve to suffer. In contrast, custody will be awarded to the custodial parents where the natural parents have relinquished control over the children as a result of their own actions, on the theory that they are responsible for the consequences. Because the impact on the child of separation from its natural parent is the same whether custody was voluntarily or involuntarily surrendered, such considerations are totally irrelevant to the central issue in a custody case, namely what constitutes the best interests of the child.

Here the majority implicitly characterizes the adulterous mother's surrender of custody as "involuntary," and therefore as a factor militating in favor of a return of the child to her custody. In so doing, they fail to consider the fact that the mother voluntarily engaged in adulterous conduct, which inevitably caused her loss of custody. The majority's inaccurate characterization demonstrates that underlying their opinion is the unarticulated feeling that, notwithstanding Maryland law, the natural mother should

not have lost custody of her child as a result of her adulterous conduct. When all is said and done, the majority here has determined that solely because the adulterous mother has "repented," and has thereby been converted, under Maryland law, from an "unfit" to a "fit" parent, six-year old Stephanie should be removed from a stable and successful environment. This determination is based upon no more than an unsupported finding that she will not be traumatized and an unsubstantiated presumption that some intangible force derived from natural parental love will provide her an environment superior to that which she has enjoyed during the previous three years of her life. Such a view is not consonant with Maryland law, which recognizes that if the best interests of the child are to be preserved, such outmoded, irrelevant and unfounded notions must be discarded. Accordingly, I respectfully dissent.

The custody of children should not be disturbed unless there is some strong reason affecting the welfare of the children.[1] To justify a change in the custody of a child, a change in conditions must have occurred which affects the welfare of the child and not of the parent.[2] In accord with this principle it has been held that, where a parent surrenders complete custody of an infant for such a long time that its interests and affections attach to the persons who have filled the place of the parent, and where the infant develops into a healthy and happy child, then, if the parent seeks to reclaim the child by judicial decree, the court should place the right of the parent subordinate to the right of those who have performed the parental duties. This is done to protect the welfare of the child which largely depends upon the ties of companionship formed over the course of the years.[3]

**1.** Krebs v. Krebs, 255 Md. 264, 266, 257 A. 2d 428, 429 (1969); Kramer v. Kramer, 26 Md. App. 620, 623, 339 A. 2d 328, 331 (1975); Sullivan v. Auslaender, 12 Md. App. 1, 5, 276 A. 2d 698, 701 (1971).

**2.** Winter v. Crowley, 231 Md. 323, 331, 190 A. 2d 87, 91 (1963); Kramer, *supra*, 26 Md. App. at 623, 339 A. 2d at 331; Peterman v. Peterman, 14 Md. App. 310, 320-21, 286 A. 2d 812, 819 (1972); Sullivan, *supra*, 12 Md. App. at 5, 276 A. 2d at 701.

**3.** Melton v. Connolly, 219 Md. 184, 188-89, 148 A. 2d 387, 389-90 (1959);

Primary reliance upon parental rights which have not intentionally been abandoned or forfeited may well be appropriate in an adoption case [4] or in a custody case in which the children have not long been separated from the parents, but such emphasis is not proper in a custody case where the best interests of a child, long separated from a parent, must govern. The strength of the family ties formed by a child with persons who fill the place of its natural parents, and the healthy and happy development of such a child, are regarded as being of such paramount importance that neither the age of the parental replacements,[5] nor the fact that the child would be united with a sibling if returned to the natural parent,[6] has been considered sufficient to justify a change in custody and the return of the child to a natural parent.

Here the record shows that Stephanie has been in the care and custody of her paternal grandparents from the age of two years and nine months, in January, 1972, to the time of the hearing on the present petition, in April, 1975, a period of three years and three months. During the last two of these three years, the natural mother had visited her on only

Ross v. Pick, 199 Md. 341, 352, 86 A. 2d 463, 469 (1952); Dietrich v. Anderson, 185 Md. 103, 119-20, 43 A. 2d 186, 192-93 (1945); Piotrowski v. State, 179 Md. 377, 383, 18 A. 2d 199, 201-02 (1941).

The validity of the Court of Appeals' policy recently has been substantiated in J. Goldstein, A. Freud and A. Solnit, *Beyond the Best Interests of the Child* (1973). The authors demonstrate that because of the law's inability to make long-range predictions, child placement should provide the least detrimental alternative for protecting the child's development. They functionally define and contrast the biological parent-child relationship and the psychological parent-child relationship. They establish that the emotional well-being of the child requires that placement decisions safeguard the child's need for continuity of relationship with the psychological parents. They conclude that in terms of the child's well-being, the rights of the biological parents are irrelevant and must be subordinated to the child's right to an uninterrupted relationship with its psychological parents.

4. *See* Dawson v. Eversberg, 257 Md. 308, 313, 262 A. 2d 729, 732 (1970); Walker v. Gardner, 221 Md. 280, 284, 157 A. 2d 273, 275 (1960); Lloyd v. Schutes, 24 Md. App. 515, 521-22, 332 A. 2d 338, 341-42 (1975).

5. Trenton v. Christ, 216 Md. 418, 422-23, 140 A. 2d 660, 662 (1958); Piotrowski, *supra*, 179 Md. at 380, 18 A. 2d at 200.

6. Lippy v. Breidenstein, 249 Md. 415, 420, 240 A. 2d 251, 254 (1968); Melton, *supra*, 219 Md. at 190, 148 A. 2d at 390.

three occasions. The paternal grandfather, age 49, and grandmother, age 44, are fit and proper custodians. The mother herself testified that Stephanie has been well cared for and loved by the paternal grandparents, and that she is "pretty normal." Stephanie's kindergarten teacher testified that the child is an "above average" student, is well-mannered, gets along well with other children, and is well-adjusted and secure.

In the absence of any evidence to show that the paternal grandparents are unfit to care for this child, and that she is experiencing any kind of difficulty, there is nothing in this record which justifies a change in custody. The stability to be provided by a continued relationship with two good and loving grandparents far outweighs any disadvantages to the child which might come from not living with her mother and her half-brother. There is absolutely no reason to expose the child to the risks inherent in uprooting her and moving her to a new environment.[7]

The Court of Appeals has recognized that custody will not be awarded merely to gratify the natural maternal affection.[8] This Court has said that "custody is not a prize to be handed by the court to the innocent or unerrant parent

---

7. Goldstein, Freud and Solnit, *supra*, describe the risk inherent in disturbing the continuity of relationships of a school-age child, at 33-34:

> "For *school-age children*, the breaks in their relationships with their psychological parents affect above all those achievements which are based on identification with the parents' demands, prohibitions, and social ideals. Such identifications develop only where attachments are stable and tend to be abandoned by the child if he feels abandoned by the adults in question. Thus, where children are made to wander from one environment to another, they may cease to identify with any set of substitute parents. Resentment toward the adults who have disappointed them in the past makes them adopt the attitude of not caring for anybody; or of making the new parent the scapegoat for the shortcomings of the former one. In any case, multiple placement at these ages puts many children beyond the reach of educational influence, and becomes the direct cause of behavior which the schools experience as disrupting and the courts label as dissocial, delinquent, or even criminal." (Footnote omitted. Emphasis in original.)

8. Townsend v. Townsend, 205 Md. 591, 596, 109 A. 2d 765, 767 (1954); Carter v. Carter, 156 Md. 500, 506, 144 A. 490, 492 (1929); *see* Atkins v. Gose, 189 Md. 542, 551, 56 A. 2d 697, 701 (1948).

solely on the basis of his or her innocence or unerring ways." [9] In my view, the fact that the natural mother has become a fit and proper custodian is insufficient in and of itself to justify a change in custody. Accordingly, I would reverse the chancellor's determination with respect to the custody of Stephanie Lee Powers.

---

**9.** Mullinix v. Mullinix, 12 Md. App. 402, 411, 278 A. 2d 674, 679 (1971).