KAREN M. ROSS *v.* JOHN H. HOFFMAN ET UX.

[No. 300, September Term, 1976.]

*Decided October 11, 1976.*

The cause was argued before MORTON, DAVIDSON and LOWE, JJ.

*Ann M. Turnbull* for appellant.

*Ronald S. Landsman* for appellees.

LOWE, J., delivered the opinion of the Court.

We are called upon to review a Circuit Court of Baltimore City's award of custody of a child to the appellees, who are

consanguineously unrelated to the child, over the protest of her natural mother.

The child (Melinda) was born to Karen Ross (the appellant) on April 16, 1967. Mrs. Ross was twenty-one years of age at the time. Inasmuch as financial necessity required her to work, she retained Mrs. Oneida Hoffman, one of the appellees,[1] as a "babysitter". Mrs. Ross' schedule of night work created a difficult situation, for she had to deliver Melinda to the Hoffmans late at night and, after working all night, pick the child up by 7:00 o'clock in the morning. The obvious implication is that either Mrs. Ross received little or no rest or the child received proportionately little maternal attention. To overcome this fatiguing schedule Mrs. Ross, at Mrs. Hoffman's suggestion, permitted the child to stay with the Hoffmans both day and night throughout the working week. Mrs. Ross would reassume her parental role by taking her child on weekends and her days off. The compensation paid by Mrs. Ross remained the same.

Although Mrs. Ross' working shifts varied between 1967 and 1971, the custodial arrangement apparently did not. Furthermore, Mrs. Ross assumed a life style which, had she taken Melinda for longer than weekends and days off, would have been incompatible with the best interests of the child. The record indicates that she may not have maintained her regular contact with Melinda during this period.[2] In addition to involvement with drugs, Mrs. Ross had several abortions. Presumably, however, because of the agreed custodial arrangement, Melinda was never exposed to these undesirable undertakings.

After 1971 it appeared that a reformation may have occurred in Mrs. Ross' way of life. The trial judge found as a fact that she was no longer involved in her former dissolute ways and, indeed, expressly stated that she was now "a very fit and proper person. . . . she is emotionally sound and a

---

1. Mrs. Hoffman is joined by her husband as appellees here and parties plaintiff below.

2. There is also contradictory testimony relating to whether the sitter's fees were fully paid with regularity during this period.

healthy person to be a mother to this child." Although we are not bound by the clearly erroneous rule, Md. Rule 1086, and may exercise our best judgment in determining whether the chancellor's conclusion was the best one, *Melton v. Connolly*, 219 Md. 184, 188 (*i.e.*, best for the welfare of the child), we must and do accept the factual findings and the chancellor's view of the evidence if they are not clearly wrong. *Sullivan v. Auslaender*, 12 Md. App. 1, 5. There is neither indication nor allegation that any of the chancellor's views of the evidence or findings of fact were clearly wrong, and we accept his finding as to Mrs. Ross' reformation.

Mrs. Ross changed her employment on three occasions between 1971 and 1974, finally settling upon employment at a nursing home. Haply, she there met her present husband whom she married on July 12, 1975. The present action was brought about soon thereafter when the Rosses, having taken Melinda for the Labor Day weekend, returned her to the Hoffmans only when the Hoffmans obtained a court order directing the return of Melinda to them. The court has, by order, since controlled further visitation by the Rosses. The case comes to us upon appeal of an order of the court below granting permanent custody to the Hoffmans with liberal visitation privileges to Mrs. Ross, and directing the continued payment of $20.00 per week child support.[3]

Appellant relies heavily upon *Powers v. Hadden*, 30 Md. App. 577, decided on March 24, 1976. In *Powers* this Court reasserted as still viable the presumption, repeated frequently if not recently by the Court of Appeals, that a child's welfare will be best served in the custody of the natural parents rather than in the custody of others. *Id.* at 581. Although this presumption was argued to the chancellor, *Powers* had not been published by the time the chancellor rendered his opinion, and appellant contends that his decision was predicated upon the erroneous assumption

---

3. There is irony, if not an aura of injustice, in an order denying a natural mother her child, then compelling payment to those who have taken her. But the issue was not raised here or below and, therefore, we do not respond to it, Md. Rule 1085, nor do we presume by our observation to preview our opinion if and when it ever comes before us. Presumably, the mother is willing to assist in the support of her child for the child's benefit.

that the natural parent presumption had atrophied by disuse. For that reason, contends appellant, the chancellor did not place a sufficient burden upon the Hoffmans to overcome the presumption.

We find no such erroneous assumption in the chancellor's opinion. The chancellor cited many of the cases upon which we relied in *Powers*, and expressly recognized that the Hoffmans had the burden of overcoming the natural parent presumption. He then stated:

> "In that context, I have analyzed the facts of this case, and I have concluded that Mrs. Hoffman has overcome that burden."

Appellant then argues that the chancellor erred in concluding that the presumption was overcome, and that he erroneously relied upon the theory of "psychological parenthood." We do not agree with either contention. The chancellor reviewed at great length the facts and testimony upon which he relied in deciding that the natural parent presumption had been overcome. He was particularly influenced by the testimony of a psychologist and by his own observations of the parties. He attached far less weight to the opinion of the adoption and custody investigator who was concededly new at her job. We find the chancellor's factual analysis detailed and convincing.

After reviewing the evidence adduced by the parties, the chancellor explained that his reasoning had, to some extent, been influenced by certain educational background factors to which he had been exposed extra-judicially, as that term applies to the evidentiary confines of this case. He said:

> "Now, very briefly, there is a book out, which is widely read, by three very well respected professional doctors, Drs. Goldstein, Freud and Solnick, called 'Beyond the Best Interest of the Child,' and in that book they point out that whether any adult becomes a psychological parent over the child is based upon a day-to-day interaction, companionship and shared experiences. And if you

look at it from that view, Mrs. Hoffman has had this advantage. She was the day-to-day person while Mrs. Ross, from Mrs. Ross' own testimony, she would go once or twice a week, and I believe Mrs. Hoffman when she said there were long periods of time, particularly during the 69-70 period where there were long periods of absences, and they say this role can be fulfilled by the psychological parent or by adopted parents or by any other caring adult, but never by absolute inactive adults, but everyday biological, whatever the relationship may be, and that they further say whatever beneficial qualities the psychological parent may offer the child to be is a wanted and needed member in a family structure, and I find that to be true in the Hoffman home.

Further, there is something I use admittedly, I think it is from the Family Law Report on Child Custody Conciliation, but it is the language I have adopted in these cases. They talk about mothering the young child. They said the word 'mothering' denoting function rather than a person. The function does not reside in the biological mother. There are tens of thousands of babies that have been reared in successful foster homes or adoptive parents or grandparents or aunts or professional representations over the notion that the biological mother is unfailingly most competent in the functioning of mothering. Many other kinds of evidence also tends to the same direction. For example, the unwanted pregnancy, therefore, unwanted children who suffer from rejecting parents. There is also wide public opinion in the increasing amount of children suffering from the beaten child syndrome, most of whom are victims of their biological parents, so biological parents reject the children just as well.

Then, they say, this article quotes from the age of six to twelve that the — that is the age of Melinda — the psychological and personality traits begin. In

that period a sense of family and home and a sense
of security and safety greatly influences the
psychological development of a child. At this age,
here again, the biological parents are not crucial. It
is the adults within the home of the child, that is,
stepparents, foster parents, grandparents, with
whom the child can interact meaningfully, and I
repeat that, to whom the child can interact
meaningfully without unnecessarily fear of rejec-
tion or hostility, suppression or misunderstanding,
and I think that is what Dr. Derivan had in
mind, why risk it, because we know what this child
can do in the home of the Hoffmans. She is well-
developed and healthy, and if we change the
custody, we are not sure whether Mrs. Ross and
her new husband and this child can interact
meaningfully with her. What the relationship with
the child would be with Mrs. Ross, and the Court
feels, as Dr. Derivan feels, maybe we shouldn't risk
this at this time."

We find no error in the fact that a trial judge continues his
general education by reading, or that his reasoning is
influenced by such education or by his experiences during
his lifetime. To expect either judge or juror to erase from
memory all that he has read or experienced, not specifically
related to the facts of a case, before deciding a case is an
absurdity so apparent as to deserve no rebuttal. Error would
result when the reasoning was obviously distorted, but not
when sound reasoning is influenced by prior experience or
education. The soundness of the chancellor's reasoning here
is apparent from the excerpt of his opinion. We do not find
that he gave undue weight to that particular underpinning
of his reasoning. Rather, we commend him both for
recognizing and expressing that which helped him to decide.

Appellant then argues that our recent opinion in *Powers
v. Hadden* requires us to apply the natural parent
presumption rigorously and find that, on the facts of this
case, the appellees could not have overcome the
presumption. But our careful review of the record convinces

us that *Powers* militates far more heavily against, than for, appellant.

Perhaps appellant's misinterpretation of *Powers* lies in the sense of rigidity, if not conclusiveness, with which the term "presumption" is viewed. Too often those skilled at law treat all presumptions as decisive irrespective of the evidence, and fail to recognize that for the most part they are merely guidelines by which to reason, conclusive only in the absence of evidence to the contrary and are aught but one more auncel weight in the judicial balance. In the natural parent context it is nothing more than a burden-placing device. It puts the burden of persuasion on the non-biological "parent" and is overcome when sufficient evidence is introduced and believed by the trier of fact to convince him that the child's best interest will be served by one other than a natural parent.

When this is accomplished below and appeal is brought here, we are faced with a sometime conflicting presumption. On the one hand, as expressed in *Auslaender, supra,* we must exercise our best judgment in deciding which party will promote the child's welfare most expediently. But because of the chancellor's proximity to the parties, he is presumed correct and we will not disturb his findings unless there is some sound reason to do so. Indeed, we concluded the *Powers* case with just such an admonition:

> "While we recognize that our review of custody awards is not confined by the 'clearly erroneous rule', *Sullivan v. Auslaender,* 12 Md. App. 1, 3-4, neither should we be oblivious to the fact that the chancellor had the opportunity to view each witness's demeanor, hear their expressive intonations, and to judge them — to some degree — on their deportment and attitude while testifying. We, on the contrary, are limited to the printed words of a cold record.
>
>> 'Ordinarily the court or judge who has had the parties before him, has the best opportunity to observe their temper, temperament, and

demeanor, and so decide what would be for the child's best interest, and unless there is some sound reason to the contrary his findings ought not to be disturbed.' *Piotrowski v. State*, 179 Md. at 381."

*Powers v. Hadden*, 30 Md. App. at 588.

Our review of the record in this case finds the chancellor's analysis sound and his conclusion reasonable. As noted above, had *Powers* been available to him, the reasoning therein would have added to, rather than detracted from, his conclusion.

We stated in *Powers* that the opinions of the Court of Appeals indicated that:

"When custody is denied a natural parent, that denial inevitably results from custodial unfitness amounting to forfeiture, as by failing to support the child, *Dietrich v. Anderson*, 185 Md. 103, 116,

'... or where some *exceptional circumstances* render such custody detrimental to the best interests of the child.' *Ross v. Pick*, 199 Md. [341] at 351; *Trenton v. Christ*, 216 Md. [418] at 420. (Emphasis added)."
*Powers*, 30 Md. App. at 584.

We then pointed out that a long period of separation could serve to rebut the presumptive preference for the natural parent, and while it does not require that custody be denied a natural parent, it places both parent and surrogate on an even keel.

Applying that principle here, we note that while Mrs. Ross frequently visited Melinda, she substantially abandoned her physical parental role for the entire 9 year life of her child. Without judging the merits of the decision made by Mrs. Ross in thus ordering her priorities, we further note that this was in the nature of a voluntary surrender of custody as opposed to the court-compelled surrender of custody in *Powers*. Voluntary surrender, as we noted in *Powers*, "has

been given substantial weight as an element of forfeiture in these [Court of Appeals] cases," *id.* at 585.[4]

Although recognizing that necessity appears to have brought about the initial week-long separations, we cannot overlook the period of intentional *mental* abandonment between 1967 and 1971. During this time Melinda's interests were overtly subjugated by Mrs. Ross to her own personal gratifications. These were the beginning and major portion of the most sensitive formative years of Melinda's life, during which Mrs. Ross' physical and psychological absence jeopardized her child's best interest. We do not and, indeed, cannot fix a period for which a parent may fulfill a hedonistic desire, casting off the robe of parental responsibility both inwardly and outwardly, before forfeiting the judicially espoused presumptive shield provided a natural parent. It is sufficient to hold that on the facts of this case, appellant has overstayed any period of amnesty for which she might expect judicial absolution in the preservation of her presumptive parental right. We further note that but for the Hoffmans the child would have been practically parentless during that episode.

Finally, we find Judge Watts' reasoning especially convincing in his attempt to eliminate the element of chance

---

4. Precedentially, we find the facts of Piotrowski v. State, 179 Md. 377 far more akin to the facts here than are these facts related to those in Powers. We described these facts in Powers v. Hadden, *supra*, 30 Md. App. at 586:

"In *Piotrowski v. State*, 179 Md. 377, the Court of Appeals continued custody of an eight year old girl in the maternal grandparents who had kept the child since she was four months old. The holding in this case is more precedentially persuasive of the proposition that the time away from the natural parent should overcome the parental presumption since it appears to have been the controlling factor in the court's determination. The father and his wife, whom he married after the child's mother died during the child's infancy, were 'well behaved, industrious, law abiding people' as were the grandparents who had custody. Without expressly so stating, the Court seemed to have decided to continue custody in the grandparents because it was doubtful that a change in custody would improve the child's environment and that, due to the substantial time away from her father, it was possible that it would be detrimental to her. That period of time, however, was nearly eight years, running continuously from infancy to the date of trial. Once again the *voluntary surrender* of custody was a factor which was also considered by the Court."

from Melinda's *immediate future*. He pointed out that the past 9 years experience have seen Melinda thrive in the stability of the Hoffman home, giving an assurance of what that relationship would provide if continued. On the other hand, while holding that the Rosses at present appear to be fit and proper parents, it can at best be supposed that Melinda will overcome the trauma of a changed environment, adjust to a new life and be provided similar guidance by her new custodians, whose marriage itself has not yet undergone the tests of adversity. Supposition for the future, without more, must give way to an assurance from the past, when prognosticating a child's future best interests. We find that reasoning most convincing and so has the Court of Appeals which said in *McCabe v. McCabe*, 218 Md. 378, 383, that we must look to the past in assessing the future.

We are in full agreement with Judge Watts' concluding observations:

> "The only reason Mrs. Ross has presented this is that she is the natural mother, and I say that is not significant, and we view it with the best interest of the child, and it would seem to be compelling from her point as contrasted with Mrs. Hoffman, but from the child's point of view it is not so significant, especially if the evidence points out she has established, and she realizes she is in a loving atmosphere where she remains with Mrs. Hoffman. She is in a loving atmosphere when she has contact, and a lot of contact with the mother and grandparents, this I am sure she will have. If you leave it with the Hoffmans, as I said, and I am not so sure we will have it if we change the custody and give it to Mrs. Ross. I said that is primarily because the marriage is new with Mrs. Ross. She has got her own growing up to do in terms of the marriage. The first two years of marriage are very crucial. If we thrust this child into that milieu at this time, it might be damaging to the child, and I think that is what Dr. Derivan meant that we can't risk that. At

the same time, I say she can reform, and she is a fit and proper mother; therefore, she will have fairly regular visitation with the child. I don't feel at this time we should thrust this child into the new environment and take her out of the love and environment she has."

Neither the result here nor anything written in our opinion should be construed so as to strike fear in the heart of parents who utilize day care facilities. Nor should paid custodians of children, left with them by parents who are by necessity forced to resolve many conflicting priorities, be entitled to a possessory deference in custodial contests. Children are not chattels, and doctrines such as adverse possession, however semantically regaled, do not apply to children. This case is — as most custody cases should be — limited to its facts and persuasive as precedent only to the extent that its reasoning is sound.

If it were not apparent heretofore from the plethora of seemingly contradictory custody cases among our appellate reports, it should now be clear that appellate courts have not and do not intend to provide rigid precedential formulae in custody cases which lawyers may with ease apply to a client's factual circumstance. We do not write in this area for the convenience of counsel. Rather, we explain as best we can the result at which we have arrived for the best interest of each child in each case.

The unimaginable multitude of human vagaries in each of us, multiplied by 3 (the contesting parties and the child) provide some insight into why cases with superficially similar facts do not always reach the same result. They also help explain the emphasis we place upon the chancellor's opportunity to evaluate the parties and their relationships to the child. That we do not adhere undeviatingly to the rigidity of a legal or scientific formula, emphasizes, rather than demeans, the care with which we approach review of these cases. While fully recognizing, and to some degree deferring to, the vantage point from which a chancellor can view the proceedings, we even hesitate to trust his judgment absolutely with so precious a responsibility. Our standard of

review is not as in other judicially decided cases — was he clearly erroneous (Md. Rule 1086); it is enough to find that he was merely mistaken. See *Auslaender, supra.*

We find no such error here.

*Judgment affirmed.*
*Costs to be paid by appellant.*