608 So.2d 1170 (1992)
Barbara Morris SAMUELS and Harold C. Samuels, Jr.
v.
Dr. John P. MLADINEO.
No. 89-CA-0952.
Supreme Court of Mississippi.
July 29, 1992.
Rehearing Denied December 3, 1992.
*1171 Lisa B. Milner, Binder Milner & Milner, Jackson, T. Mack Brabham, Brabham & Bean, McComb, for appellants.
Whitman B. Johnson, III, Steen Reynolds Dalehite & Currie, Jackson, for appellee.
Before HAWKINS, P.J., and PRATHER and McRAE, JJ.
EN BANC.
HAWKINS, Presiding Justice, for the Court:
Barbara M. Samuels and Harold C. Samuels, Jr., appeal from a jury verdict and judgment in the circuit court of the first judicial district of Hinds County in favor of Dr. John P. Mladineo in a malpractice action. Because the verdict of the jury is against the overwhelming weight of the evidence, we reverse and remand for a new trial.

FACTS

FEMALE ANATOMY
The uterus, or womb, is a hollow, thick-walled, muscular organ in the shape of an inverted pear situated between the bladder (anterior) and the rectum (posterior). In a non-pregnant woman it is about three inches in length, two inches wide, and an inch thick. The upper rounded portion is the fundus, at each extremity of which is the cornu or horn marking the part where the fallopian tube joins the uterus, and through which the ovum travels after leaving the ovary. The uterine (fallopian) tube connects with an ovary. The uterus is supported in the pelvic cavity by the broad ligaments, round ligaments, cardinal ligaments, and rectouterine and vesicouterine folds or ligaments. It is a constantly changing organ. The elongated lower part of the uterus is the cervix. The cervix is about an inch long and extends into the upper portion of the vagina. The tissue of the cervix has the consistency of the nose, and moves freely.
The vagina extends from the vestibule to the uterus, and is situated behind the bladder and in front of the rectum. It is directed upward and backward. Normally it is about two and one-half to three inches long in front, and three and one-half inches long in back. Its base is approximately the size of a half dollar.
Both the uterus and the vagina are susceptible to very large dilation. The uterus encloses the developing fetus, and the head, the largest part of the fetus, must pass through the vagina at childbirth.
Aging, wear and tear, and especially childbirth, alone or in combination with their attendant stretching frequently cause the uterus and vagina and surrounding tissue to become weak, and unable to support encroachment from the rectum and bladder. This may result in one or more of the following conditions, namely: a stretching and distension of the bladder downward (cystocele); a rectocele, in which the rectum bulges anteriorly into the vagina; or a uterine prolapse, or "descensus," which is a downward displacement of the uterus into the vagina.
One or more of the above conditions (they frequently occur in some combination), may sufficiently develop to necessitate a hysterectomy, which is a surgical removal of the uterus (hyster). In a hysterectomy with anterior and posterior (A and P) repair, the vagina, and also surrounding tissue are surgically repaired to resist encroachment by the rectum and bladder. This in turn requires dissection and suturing of the vaginal mucosa (lining) and wall and surrounding muscle. A hysterectomy inevitably causes some alteration in the size of the vagina.
In a vaginal hysterectomy, with which we are concerned in this case, the uterus is severed from surrounding tissue and removed by pulling it through the vagina.
More about this surgical procedure will be explained in the course of this opinion.

*1172 FACTS
Barbara Morris Samuels and Harold C. Samuels, Jr., are husband and wife. Barbara is a registered nurse. In 1985, following the birth of her second child, when she was 31 years of age, and while on a routine of walking two miles to lose weight, she felt pressure in her vaginal area. This alarmed her. When she got home, she examined herself and saw "something kind of hanging out."
In May, 1985, she consulted a Dr. Odom, the obstetrician who delivered her second child and performed a tubal ligation. He diagnosed her as suffering from pelvic relaxation.
The condition did not improve, and on August, 28, 1985, she consulted John P. Mladineo, M.D., the defendant and a gynecologist, because of "some development of pelvic relaxation," at which time she described "everything was falling out." He found a small defect anteriorly in the vagina, with a small "cysto-urethrocele" in the upper portion, and a developing rectocele. The cervix was large, but otherwise unremarkable, the upper limits of normal and consistent with someone who had been pregnant. There was some relaxation or looseness to the ligaments of the uterus, but not of a significant nature. (Vol. III, 365) Because her problem was of a relatively mild degree, and she was less than six months post-delivery of a child, he felt that nothing should be done at the time.
In mid-December, 1985, she consulted Richard C. Boronow, M.D., a gynecologist. She was eleven months post-partum and had undergone some heavy bleeding and heavy periods. She had a sense of heaviness in the pelvis and a recent yeast infection. Upon examination he found a "quite prominent" degree of pelvic relaxation, which to him was not all that unusual. He noticed a "little cystocele and rectocele and a little descent of the uterus. Overall, it was a reasonably significant relaxation." Although he felt she was a "candidate" for "vaginal plastic surgery," he did not find her symptoms significant enough to go ahead at that time, and he encouraged her to avoid surgery as long as possible.
Barbara returned to Dr. Mladineo's office January 29, 1986, at which time he found "there had been significant progression in her pelvic relaxation." He found significant progression of both the cysto-urethrocele and rectocele, a descending uterus, with the cervix upon coughing or pressuring coming out of the vagina. He recommended surgery by a "vaginal hysterectomy and an A and P repair." He also told her that because of the progression of her problem the vaginal repair might not be sufficient, and she might require an abdominal incision and a "Marshall-Marchetti procedure" to suspend the bladder. For insurance purposes, Barbara also obtained a second opinion from Helen Barnes, M.D., who concurred in this assessment.
Barbara is a surgical nurse and had seen both Drs. Boronow and Mladineo perform surgery. She had a high regard for them both professionally, but because she had one time been employed by Dr. Mladineo, she chose him for her surgery. She was admitted to the Baptist Memorial Hospital March 24, 1986, and a vaginal hysterectomy with A and P repair was performed March 25. During surgery, Dr. Mladineo's examination of the ovaries showed the left one normal and the right with a cyst, and he removed the right ovary as well during this surgery.
Following surgery, Barbara's and Dr. Mladineo's testimony is conflicting. According to her, following surgery the inserted catheter with packing was very painful, and Dr. Mladineo did not come by to check on her. It disturbed her that even upon her discharge April 2, she was told to keep the catheter in, which to her was unusual. Upon her first post-operative visit to his office, he did not see her. One of his nurses checked her for urine residuals, which took all morning. Approximately a week later, she returned to Dr. Mladineo office, but again only got to see his nurse. This greatly disturbed her, because she was a nurse and had worked with Dr. Mladineo, and needed reassurance.
Her husband, Harold, got upset and on April 21 called a physician friend, Dr. *1173 Charles Bush, who gave him some catheters for self-catherization and medication to stimulate her bladder to begin functioning again. Dr. Bush's prescription worked and she was able to resume urinating without a catheter.
Her final visit to Dr. Mladineo was a six-week check-up at which time, according to Barbara, he did examine her. She said it was very painful, but she attributed this to the healing process. She said that at the conclusion of this examination, Dr. Mladineo patted her on the leg and told her to "Go and enjoy."
Prior to her surgery there had been no difficulty in the sexual relation between Barbara and Harold. Following surgery, however, she was unable to resume sexual relations. Her vagina "was like a block." Repeated attempts were unsuccessful, and she consulted Dr. Bush. He examined her, which she said was very painful, and then prescribed a dilator and jelly to enlarge the vagina. This did not help, either. Over the months the couple's efforts at sexual intercourse were unsuccessful.
According to Dr. Mladineo, he did check on Barbara while she was hospitalized, and it was not all that unusual for a patient to have to keep a catheter in several weeks following surgery. He testified that when she came to his office on April 10 and 17 her urine residuals were checked. His office records showed she returned to his office on May 2, but he did not see her then.
As to the final six-week check-up, which Dr. Mladineo's office records showed to be May 13, Dr. Mladineo testified that there was no indication on his records that he did indeed examine her that day. He had no recollection of having examined her that day, but said a six-week examination of a patient who had this surgery would normally be painful. At his pre-trial deposition, Dr. Mladineo had stated he did not examine Barbara on this last visit.
May 13, 1986, was the last time Dr. Mladineo saw Barbara as a patient.
Barbara returned to Dr. Boronow on November 10, 1986. He said she "was in tears and was an emotional wreck. She was sexually non-functional." Sexual relations were "an anatomic impossibility."
My examination confirmed what she was telling me. With two fingers pressed tightly together, I could just barely, with great discomfort, do a limited examination. The vagina was short, but very, very narrow, very rigid. And for her to tell me that they were unable to have a normal sex life, it was perfectly obvious that she was telling the truth.
Dr. Boronow testified that she had been trying to use some dilators and hormone cream to soften the tissues which were quite fixed and rigid. He believed, however, she needed another operation to "open things up and to reconstitute sexual adequacy."
At trial Dr. Boronow at length explained a vaginal hysterectomy and what had occurred in this case.
A. (Witness steps down to the chart.) In the course of the operation, what the surgeon does, in addition to removing the uterus, will undermine the [vaginal] walls. So, we are basically talking about the vaginal cylinder, which is the vaginal skin and the muscle lining, tubular cylinder, nestled in between the bladder and the rectum with the support muscles. So, what we make an effort to do is free those two layers, separate them one from the other, plicate [fold, plait, tuck] or tie together the anterior wall and posterior wall musculature to build up support. And, then, excise excessive vaginal wall and re-approximate.
Of course, there's two sources of potential problem: Plicating or tightening things together too tightly, and/or cutting off too much. And in this case, it appeared that probably both factors were operative.
In addition, this enterocele component. Sometimes you can get too vigorous and take off too much wall because this area bulges. So, there was an old expression in Wisconsin where I grew up about the frustrated carpenter who complained that he cut off a board *1174 three times and it was still too short. And it just seemed  it was apparent that Mrs. Samuels was not like eighteen or twenty, she was eight or ten. (Witness resumes stand.)
... .
Q. Okay. Directing your attention to the excision of vaginal mucosa and the sewing up of the vaginal wall, would you tell the jury what a minimally competent physician in the exercise of ordinary care should do?
A. Well, the operation of this type is  is a very methodical step-by-step approach and there are several teaching guidelines that we all grew up with and try to incorporate into our practice; and that is, keeping in mind what the potential problems are and what the challenge of the surgery is. One of the rules usually to keep in mind is, if you are going to make an error, err on under-correcting rather than over-correcting, because once it's removed, you can't put it back.
That is not to say that you don't want to do an adequate job. But at each step of the operation, you assess how much you've mobilized, how much you're snugging up, how much you're going to cut off, so that in your mind's eye and as you draw these tissue planes together, you can see that there is going to be an adequately competent vagina.
Q. Would you tell the jury what are possible causes of a narrowed and shortened vagina post-hysterectomy?
A. Sutures too tight in the deep layers, and cutting off too much in the vaginal cylinder layer.
... .
Q. Thank you. Dr. Boronow, would you tell the jury, based upon your examination of Barbara Samuels both before and after Dr. Mladineo's surgery, do you have an opinion to a reasonable degree of medical certainty as to what caused the narrowing and shortening of Barbara Samuels' vagina?
A. Oh, I do.
Q. And what is that opinion?
A. Sutures placed too tightly and too much tissue removed.
Q. Do you have an opinion to a reasonable degree of medical certainty as to whether or not Dr. Mladineo fell below the standard of care used by minimally competent physicians in this field throughout the United States?
A. I do.
Q. What is that opinion?
A. That he did.
Q. And would you tell the jury why you feel this way or on what you base this opinion?
A. Well, certainly, the result. I saw her before. She was  had a healthy, happy sex life. She had vaginal competence. Following the surgery, she was a sexual cripple, in addition to an emotional wreck. And she had  well, I don't need to go into what happened, but the examination  she said she was a sexual cripple, and I examined her and she was; and I had seen her before and afterward.[1]
Q. Was there any medical necessity to shorten or constrict Barbara's vagina such as was done by Dr. Mladineo?
... .
Q. Any medical necessity for doing that?
A. No. I  I don't think of any reason. I would liken the vaginal reconstructive surgery to people who sew and who are accustomed to sewing. If you set out to make a dress and cut a fabric that's going to be a size ten dress and you end up with a size five, you've messed up. It's not that you put a stitch or two in too tightly, but it was a flawed design.
... .
CROSS-EXAMINATION
Q. You can tell if you're taking out too much when you do it; can't you?

*1175 A. You should. You should make an intraoperative assessment at each step of the way.
Q. And you can tell when you're plicating the fascial planes if you're making them too tight; can't you?
A. You should.
Q. At the end of the surgery, you can tell if it's too tight; can't you?
A. Well, then it's too late if you've cut off too much.
Q. But my question is, Doctor, if you check it at the end of the surgery  aren't there ways that when that happens that it can be repaired in the operation at the time?
A. We're talking about two components: The underlying muscle that you pull together. If that's too tight, that can be redone. But once you've cut off too much vagina, there's no way you can redo that. That's why one of the standard approaches in doing this surgery is to assess as you go before you cut, before you sew, and make your decision as you go along, not after the fact.
... .
RE-DIRECT
Q. On cross you were referring to a methodical approach and how a surgeon when doing a hysterectomy has to make sure at each step that it's done correctly. Could you tell the jury what the steps are you're referring to and what you're supposed to do to make sure it's done correctly?
... .
A. It's a decision of how much to dissect in terms of mobilizing the bladder and the vaginal wall, the rectum and the vaginal wall, the enterocele at the top, how much to remove and it's  we're taught, and I think that most people are taught, that you make a very careful intraoperative assessment of each of these steps. And when you begin to determine how much to snug up, you can place stitches and begin to pull and see how it looks and how it feels, and often you will replace the stitches.
Once that layer above and below is completed, then the task of removing vagina  and you can pull with the clamps, you can pull the tissues together and eyeball what  how much you should take off. And pretty standard teaching is trim a little and re-approximate and take a look. And if that's fine, that's fine, but if you should take off a little more, then do it. But once an arbitrary decision is made to cut and the vaginal wall is removed, there's no putting it back. It's like cutting the fabric. If you're going to make a size ten and you cut off for a size five, you can't put it back.
Q. Dr. Boronow, Mr. Johnson asked you a lot of questions about not being in the operating room with Dr. Mladineo when he performed this surgery. Are you satisfied that you can tell from the records and from your examination of Barbara before and after Dr. Mladineo operation as to what happened to her?
... .
A. Well, it's not  I'm not making any judgment from the records; I'm making a judgment from what I saw. I saw her before and I saw her after. And, before she was sexually active and functional, and post-operatively she was a sexual cripple. I'm not answering from any records. I'm answering from what I saw before and after. (Emphasis added)
Dr. Boronow felt Barbara needed reconstructive surgery and referred her to Raymond A. Lee, M.D., chairman of the division of Gynecologic Surgery at Mayo Clinic, who saw her January 26, 1987. He found she had a functional shortening of the vagina with an adhesive constricting band at the apex, and there was a scar-like band which was causing painful sexual relations. He had difficulty examining her because insertion of his index finger caused discomfort and pain. Normally, the physician uses two fingers in examining the vagina. He did not try to insert a speculum because of this. He could reach the back of her vagina with his finger.
*1176 Dr. Lee said at the end of her vagina there was a bar-like painful area that could be plucked like a violin string with his finger. A bar went down from the front of the vagina to the back, and touching it was extremely painful to Barbara.
The following day he performed a reconstruction of her vagina with a pedicle full-thickness perineal skin flap.[2] In doing so, he had to dissect the vagina to separate the base of the bladder and anterior rectal wall.
Dr. Lee described his surgery and findings as follows:
A. When she was asleep, of course, one can examine the patient without the pain and discomfort and her muscles are then relaxed and gives one more an accurate assessment of the whole tube of the vagina. And one was struck that not only did she have the vertical bar that we have mentioned at the apex, but just inside the opening, we say the introitus, just inside the introitus, maybe an inch and a half in there, there was a muscular band that went crossways, from side to side in the introitus  just inside the introitus. And, then, starting at mid-vagina, another area which was very firm from narrowing of the vagina.
Q. Okay, sir. When she described the fact that she had painful intercourse with her husband and really couldn't engage in normal marital relations, once you got in there and saw the condition that she had, did it come as any surprise to you that she was having that problem with her husband?
A. No. One could appreciate why this would be uncomfortable. And both the introital narrowing and mid-vaginal narrowing had to be released. It had to be cut so that it would open up this vagina. And when one then made an incision up the vagina, literally with a knife and then with the scissors, normally the walls in the normal vagina would be in perfect approximation. They would have a cut through them but they would lie together. But I noticed as I made this incision that the tissues on their own spread apart, such that there was  depicting the underlying tension that had been used to pull the walls together. When one made a straight-line incision, suddenly, instead of being the straight line, there was quite a space separating the walls of the vagina.[3] (Emphasis added)
... .
Q. Okay, sir. Now, Dr. Lee, let me ask you this: When you cut through there and you saw her spread apart under this tension five centimeters, what did you have to decide to do in order to correct the problem that she had?
A. Well, the dilemma one has is if you make the incision, one can't leave this raw, separated space. And if you try to close the space, then you have recreated the problem that we had in the beginning. So, one needs to put some tissue to bridge the gap of the separated vaginal walls. One must place something in there. If you try to bring them back together again, we've tightened up the vagina again in the same position.
Q. Okay, sir. So, what was it that you did?
A. Well, we call it swinging or moving a perineal flap. This whole area is called the perineum. And I made the incision out lateral, a tongue-like bridge of tissue, much like your tongue. And I measure how wide the defect is and then take a similar measurement out here. And then I free this tongue of skin  thin skin and subcutaneous tissue  which hangs down there and it's still attached posteriorly. And then I swing it from there and lay it in this [vaginal] space.
... .
A. And, then, swinging it into this defect permits closure along the edge, then, of the retracted vagina on this *1177 side and the retracted vagina on this side, and gives you increased diameter without  and covers the raw space without narrowing down the lumen [the base of the vagina].
Q. Okay, sir. Dr. Lee, if you need to, you can look at your medical records, but let me ask you this: In looking at your medical records, or if you remember, how long was this tongue of tissue that you made for Mrs. Samuels?
A. Well, you measure that because you literally have a sterile ruler there, and you measure how long the defect is and how big a tongue of tissue you have, because you want to be sure you've got enough tissue to fill the defect. It wouldn't be good to fill all but the top inch or something like that. So, you've got to measure that. And this was fourteen centimeters [approximately five and one-half inches] long... .
... .
A. Once we made this initial incision up  we made this initial incision up the vagina, then you would find that the bladder and the rectum are in perfect apposition, because the uterus that's normally here is gone. So, then, in order to get more length, I separated the back of the bladder from the wall of the rectum to get us longer from here up to here. In order to increase the length, I separated them. And, so, the tongue of tissue that we measured, fourteen centimeters, went into the top of the vagina and then was the roof of the vagina and a little bit of the base of the bladder. In other words, it went up the back wall to the top and curved a little bit to the front.
Even after this surgery Barbara's vagina was still too short. In June, 1987, she returned to Dr. Lee and underwent another surgical procedure whereby an adhesive scar at the apex of the vagina was released. Following this she and her husband were able to resume sexual relations.
Dr. Lee said that the uterus in a female has "give-ability," that as a woman walked the uterus actually "bobs up and down a little bit within the vagina." In a hysterectomy the apex of the vagina was closed, following which there was not the moveability which existed with the cervix in place.
He described the vaginal mucosa as a "sort of a succulent, stretching layer which lines the vagina, much like the lining of the inside of your eyelid." The connecting support tissue surrounding the vagina was "fibrous tissue that you might notice in a beef steak." Dr. Lee described the condition such as Barbara had prior to her hysterectomy and the procedure used to correct it:
A. Most of the time this is a composite problem. There's not only prolapse of the uterus, there will be some  the same thing that permits the uterus to fall will also permit some of the bladder wall to stretch out and prolapse or some of the rectal wall to stretch out and prolapse.
And, what one does is to get  shorten some [of] these ligament supports which act as suspenders to pull the uterus up into the vagina, and so that supports the top of the vagina. And then you fold in and imbricate the fascia or the gristle part that's supporting the bladder and the rectal areas in order to re-support these structures and put them back into the vagina rather than prolapsing out of the vagina.
... .
A. [C]ustomarily you remove the uterus first, and repair the top of the vagina. After that, you repair the bladder wall area, which is the anterior vagina, and then, next, the posterior vaginal wall or the rectocele posterior vaginal wall.
... .
A. One has to think of this as a  as you are looking up the vagina, as you would be looking through a tube, like so; and when you look up the vagina, you see the cervix at the top of the vagina projecting down the vagina, like I said before. And you make an incision about the cervix, cutting the attachments of the vaginal wall.

*1178 Then proceed, then, with instruments applied to the cervix to pull that down so that one can get in behind the uterus here, or anteriorly. The side view shows anteriorly lifting the bladder off. The bladder is under this retractor, now. Here it is anteriorly. You lift the bladder off to get into what we call the anterior cul-de-sac, the space separating the uterus from the back of the bladder.
Then, you get in behind the uterus, which is the space called the posterior cul-de-sac. So, then, it's free in the front, it's free in the back, so then you've just got to go up each side of the uterus to remove the uterus.
... .
Q. Okay, sir. That's fine. (Witness resumes stand.) Dr. Lee, when a surgeon is going to perform a hysterectomy or a hysterectomy with an A and P repair on a lady who is still sexually  who is still involved in sexual intercourse, is that something that the surgeon considers at the time of the surgery with regards to maintaining her sexual function?
A. Yes.
Q. And would that be something a surgeon would always know ahead of time, that that's what he would be wanting to do, is maintain the proper sexual function of a female?
A. If it's important to that patient. Yes.
... .
Q. Dr. Lee, I will come back to this again in just a minute, but I want to ask you this right now: In Mrs. Samuel's case, was there any medical necessity whatsoever in your opinion to shorten the functional length of her vagina?
A. No.
Dr. Lee said that once the uterus was removed, "one over-sews the distal end of the vagina, so you have a suture line at the top." The tissues along the base of the bladder would then be repaired and sutured, as would be the tissues along the front of the rectum. Because of the relaxation of the wall in the vagina, the walls of the bladder and rectum could bulge into the vagina. "And, so the physician then would resect some of the redundant skin and tighten up this tissue, kind of like a vest or pants, and tighten it up." The more of the upper vagina that is resected, the shorter it will be. Likewise, as to the tissue adjoining the bladder and rectum, the more resected, the narrower the vagina. He said the surgeon had a dual responsibility to tighten the tissue to prevent a bulging of "the wall to come out of the vagina," and also avoiding making the vagina too small. He said that if the tissues were together too tightly there would be a "ridge-like bar across that area."
Dr. Lee was of the professional opinion that Dr. Mladineo fell below the minimum standard of care in his tightening of the underlying tissues surrounding the vaginal wall, and in removal of an excessive amount of her vaginal wall.

TRIAL
On August 4, 1987, Barbara and Harold filed a malpractice action against Dr. Mladineo, and trial was had May 1-4, 1989.
At trial the facts above set forth were adduced into evidence. When the plaintiffs rested, the first defense witness was Calvin Hull, M.D., a board certified gynecologist practicing in Jackson. Dr. Hull had reviewed all of Barbara's hospital and medical records of Dr. Mladineo, Boronow, Bush and Lee. He was then asked a hypothetical question from his review of the records, and as to her surgery on March 25, 1986, assuming "that after concluding the repair, he (Dr. Mladineo) was able to insert two fingers in the vagina and he found that the depth and diameter were appropriate and he found no constrictive ridge in the vagina," whether the surgery performed was minimally competent. Dr. Hull was of the opinion that Dr. Mladineo performed the surgery competently. He felt her condition was caused by excessive scarring, "just natural scarring. Some people scar more than others."
As his own witness, there was no difference of opinion between Dr. Mladineo and *1179 Drs. Boronow and Lee as to the type of surgery and procedure to be followed in a vaginal hysterectomy. Dr. Mladineo gave a detailed description of the vaginal hysterectomy with A and P repair he had performed on Barbara. According to him, he took all the precautions and safeguards a gynecological surgeon would take in avoiding suturing the surrounding muscle tissue too tight, as well as in removing a portion of the vaginal wall. He read from the pathology report of the tissue removed, which did not show enough tissue excised to cause her problem. Dr. Mladineo said that if he had removed the amount Dr. Lee found, it would have been impossible to "re-approximate the edges so that you could close that and it would heal."
As to the five centimeter wide gap Dr. Lee found when he cut through the vaginal wall, he testified this did not surprise him:
[B]ecause what he has done in incising the vaginal incision and then the scar tissue underneath, what he's basically doing is tearing down the repair that I had done. And the tissues are retracting to where they had been prior to my repair.
Instead of the normal healing process, in her case there was "for some reason this tremendous reaction in several areas of tremendous scar formation that was not anticipated nor expected." It was his opinion that Barbara "developed a severe post-operative reaction to the incisions and subsequently developed severe scar formation in several areas that were totally unexpected." He based this upon the records of Drs. Bush, Boronow and Lee, "and more importantly, my knowledge  first hand knowledge of having done the surgery and what was done at the time of the surgery and my examination at the end of the surgery of what it was like and what it felt like."
He testified:
I think the surgery that I did on Mrs. Samuels was very appropriate, using my best judgment and experience and knowledge and having done many of these procedures. I do not feel that the  there was excess tissue removed or there was excess repair or narrowing of the vagina. At the conclusion of the surgery, it was a normal examination with normal diameter, normal depth. And, unfortunately, she had formed a tremendous amount of scar tissue that I had not anticipated and expected.
In describing his surgery he testified that he took out the proper amount of tissue because "it re-approximated and closed easily without any tension."
According to him, he was careful to see there was adequate depth and diameter. At the end of the procedure he made a "bimanual exam" as he had been taught "many years ago" and "it's just something that I automatically do sort of as a reflex situation." He put two fingers in the vagina. He said that if he had done what Drs. Boronow and Lee had testified, it would have been clearly noticeable, but he had no difficulty with his two fingers in the vagina.
Upon cross-examination it was pointed out that in his very extensive dictated operative notes there was no mention that he had done a bimanual examination at the end of her surgery as he testified. While admitting it was not in the dictated record, he stated this examination was done.
In their cross-examination of Drs. Boronow and Lee defense counsel never questioned either physician as to whether or not Barbara's condition could have resulted from a totally unexpected, abnormal scarring, and not because too much tissue had been removed.
The professional qualifications of Drs. Mladineo, Boronow and Lee, briefly summarized, are:
Dr. Mladineo
Dr. Mladineo practiced primarily in the areas of gynecologic surgery and gynecologic oncology. He performed approximately 500-600 gynecologic surgeries per year and had performed approximately 150-200 hysterectomies with A and P repair in the ten to fifteen years he had been in practice. He is board certified by the American Board of Obstetrics and Gynecology and was a member *1180 of several professional societies and organizations.
Dr. Boronow
Dr. Boronow is a nationally recognized gynecologist. Dr. Boronow had been a practitioner of gynecological surgery in Jackson since 1960. At one time he was the chairman of the Department of Obstetrics and Gynecology at the University of Mississippi Medical Center and had published sixty-eight articles in medical journals and had co-authored a book on gynecological cancer. Dr. Mladineo acknowledged that Dr. Boronow had a national reputation.
Dr. Lee
Dr. Lee is a pre-eminent gynecologist. Dr. Lee had been chairman of the Department of Gynecological Surgery at the Mayo Clinic since 1983 and had been on the staff of the Mayo Clinic since 1965. Since 1969, he had performed over 600 gynecological surgeries per year. During his career, he had written 75-85 articles which had been published in medical journals and 10-12 chapters in medical textbooks. Dr. Mladineo admitted that Dr. Lee was generally considered to be one of the premier gynecological surgeons in the world.
Dr. Boronow had only testified in a malpractice action against a doctor upon one occasion, and that time for the defense. Dr. Lee had testified twice in his lifetime in a medical malpractice action, both times for the defense.
The sole issue presented to the jury was whether Barbara's problem was caused by negligence on the part of Dr. Mladineo, or resulted from scar tissue which developed after surgery, and unrelated to making her vaginal wall too small.
The jury returned a verdict for Dr. Mladineo. Mr. and Mrs. Samuels have appealed.

LAW
The Samuelses raise but two issues on appeal, the first that they were entitled to a peremptory instruction or j.n.o.v. against Dr. Mladineo, which has no merit; or second, that the verdict of the jury was against the overwhelming weight of the evidence, and the trial court should have granted them a new trial on this ground.
A jury verdict is absolutely binding on all factual disputes, and concludes all factual controversy. Manifestly, no jury verdict should be set aside lightly; the occasion for doing so should never arise except in rare and unusual cases. Grimsley v. Tyner, 454 So.2d 482, 484 (Miss. 1984); Elsworth v. Glindmeyer, 234 So.2d 312, 321 (Miss. 1970); Employers Mut. Cas. Co. v. Ainsworth, 249 Miss. 808, 825, 164 So.2d 412, 419-20 (1964); Straight v. Brinson, 246 Miss. 132, 134, 149 So.2d 515, 515-16 (1963).
Whether or not to grant a new trial as being against the overwhelming weight of the evidence is addressed to the sound discretion of the circuit judge, and this Court is not at liberty to reverse on this ground unless we find that there was a clear abuse of this discretion. Miss.R.Civ. 59 Clark v. Columbus and Greenville Ry. Co., 473 So.2d 947, 950 (Miss. 1985); Tucker v. Kelly, 381 So.2d 1030, 1032 (Miss. 1980); Mississippi State Highway Commission v. Hancock, 309 So.2d 867, 871 (Miss. 1975); Dorr v. Watson, 28 Miss. 383, 395 (1854).
We have attempted formulas, and set forth factors to be considered by the circuit judge in deciding whether a new trial should be ordered. James v. Mabus, 574 So.2d 596, 601 (Miss. 1990); Bobby Kitchens v. Miss. Ins. Guar. Ass'n., 560 So.2d 129, 132 (Miss. 1989); Jesco, Inc. v. Whitehead, 451 So.2d 706, 715-16 (Miss. 1984) (Robertson, J., concurring). While helpful, manifestly none can be entirely satisfactory or all embracing, however, because human behavior defies precise categorization. In the final analysis, it is only when the experienced circuit judge, after examining all of the facts unique to each case "is left with a firm and definite conviction that the verdict if allowed to stand would work a miscarriage of justice," that the granting of a new trial on the weight of the evidence is justified. Anchor Coatings v. Marine Inds. Res. Insul., 490 So.2d 1210, 1215 (Miss. 1986); Clark, 473 So.2d at 950; *1181 Tucker, 381 So.2d at 1032; Chapman v. Powers, 150 Miss. 687, 694, 116 So. 609, 611 (1928).

THIS CASE
In this case the following facts are established:
Mrs. Samuels's vagina created no sexual intercourse problem prior to surgery; following surgery it was impossible to engage in this marital relation. The vaginal A and P repair is what brought about her problem.
All gynecologists testifying in this case are well qualified in this specialized field of surgery.
There was no disagreement between them as to the surgical procedures and precautions which should be followed in a vaginal hysterectomy.
From the testimony of Drs. Mladineo, Boronow and Lee, all agree that if Mrs. Samuels's problem arose from surgical removal of an excessive amount of her vaginal wall and suturing the surrounding tissue too tightly, this would be negligence.

THE ISSUE
Did this inordinately small vaginal space result from Dr. Mladineo's removal of too much of Mrs. Samuels's vaginal wall and suturing the surrounding tissue too tightly, or solely from an abnormal and totally unexpected scarring process which was unrelated to the manner in which this surgery was performed?
This is the sole question, and the overwhelming weight of the evidence in this case leads us to the first conclusion.
The only physicians who testified in this case and who saw and examined Mrs. Samuels were Drs. Mladineo, Boronow and Lee. The only physicians testifying who examined her after she left the operating room on March 26, 1986, were Drs. Boronow and Lee.[4]
Drs. Boronow and Lee were not testifying from a medical record or a hypothetical question, but instead what they actually observed when they examined Mrs. Samuels. If one were called upon following her surgery to select the most competent gynecological surgeon in Mississippi to examine Mrs. Samuels and determine whether or not her vagina was inordinately small or simply obstructed by excessive scar tissue, Dr. Boronow would certainly be an excellent candidate for this choice. If one were called upon to select the most competent physician in the United States to make such examination, Dr. Lee would likewise be an excellent candidate for this selection. Dr. Lee had a special, and what surely must have been a personally unpleasant reason for recognizing precisely what caused Mrs. Samuels's problem. On direct examination he acknowledged that during his years of practice he had himself upon two occasions unfortunately excised too much of his patient's vaginal wall in performing a hysterectomy.
It defies reason to assume these two eminent gynecologists did not have the rudimentary gynecological knowledge to determine whether the size of Mrs. Samuels's vagina was much too small, or was simply obstructed by an excessive amount of scar tissue. From their days as residents both knew each methodical step which had to be taken in a hysterectomy with A and P repair, the special care and attention required in each step, to cut little by little, never too much, and gradually excise the amount required, and what would happen if these steps were not scrupulously followed with painstaking care. In short, they could tell exactly what had happened to Mrs. Samuels and precisely why.
Dr. Mladineo had no such knowledge. At the most he had his own recollection that when he was performing surgery he did not make her vagina too small. He also testified that at the conclusion of her surgery he made the customary bimanual examination with his hand and found the vagina satisfactory. This again had to be from his own recollection, because his operative *1182 notes dictated at the time, detailed as they were, contained no such notation. He had no recollection of having examined her on the six-week checkup on May 13, 1986. His office notes of that date make no mention of a vaginal examination. Johnson v. Ferguson, 435 So.2d 1191, 1195 (Miss. 1983); Gulf Insurance Co. v. Provine, 321 So.2d 311 (Miss. 1975); Kress and Co. v. Sharp, 156 Miss. 693, 126 So. 650 (1930).
While not decisive, our conclusion is fortified by the fact that neither Dr. Boronow nor Dr. Lee was cross-examined on this crucial question, which was Dr. Mladineo's entire defense. Neither was asked, "Doctor, is it not entirely possible that Mrs. Samuels's problem arose solely from an abnormal amount of scar tissue forming which obstructed her vagina, and which was not in any way connected to or caused by removal of too much of her vaginal wall?" It was only when the defense began its case that this theory was advanced as the cause of her problem. It takes no imagination to conclude that Dr. Lee, if asked this question would  if he could have  given Dr. Mladineo the benefit of the doubt. Drs. Boronow and Lee, neither of whom had ever testified against a physician in a malpractice action, could have taken no pleasure in the testimony they were constrained to give in this case.
Dr. Mladineo, of course, was entirely correct in his statement that the records of Mrs. Samuels's medical examinations following his surgery revealed an abnormal amount of scar tissue. What he neglected to add, however, was what could have been the cause of such obstructive scar formation. If he indeed removed too much of her vaginal wall and had to stretch the remainder together in suturing the wound, thereby creating a tension on the portions of the wall sewed together, this in itself could have been the prime cause of an enlarged scar formation. In such event, the excessive scar tissue formation did not simply cause the problem, it made the problem worse. Among the factors which may cause an abnormal amount of scar formation are "excessive tension on the wound, unfavorable site and inaccurate wound closure." R. Leichty and R. Soper, Synopsis of Surgery 7 (1985). See also, J. Thompson and J. Rock, Operative Gynecology 212 (1992); E. Perry, R. Corry and J. Perry, Basic Surgery Practice 67 (1987); A. Borges, Elective Incisions and Scar Revision 27 (1973). As Dr. Lee testified, if the tissue were sutured together too tightly, there would be a "ridge-like bar across that area." (Vol. II, 96)
There is another reason reliance upon Dr. Mladineo's recollection must be lessened. The one act at the conclusion of his surgery which would have assured Dr. Mladineo that he had made no mistake was a two-finger, bi-manual examination. He testified he did this examination. Yet his detailed operative notes make no mention of this simple, but quite important act. Six weeks later, a time when the patient is supposed to receive the final checkup by the surgeon to see that the surgery was successful and the wounds have healed properly, Mrs. Samuels recalled the examination as being acutely painful. She had to grab the office nurse's hand during it. Yet, Dr. Mladineo had no recollection of this examination, and his office notes did not mention it. The very reason for contemporaneous notes of surgeries and office examinations is the fallibility of human memory.
How can his recollection of having done a simple bi-manual examination at the conclusion of his surgery, which according to him as uneventful, be depended upon when he had no recollection of his examination of Mrs. Samuels six weeks later which was so painfully eventful to her? And he had no notes of either. Both events would normally be recorded in some way by the doctor, especially one with the stature of Dr. Mladineo.
A surgeon's memory, his recollection, that he performed every step of some particular surgery properly cannot withstand physical evidence to the contrary. A surgeon's recollection to the contrary could not remove the fact that a hemostat or a sponge is later found in the abdomen of his patient. Long v. Sledge, 209 So.2d 814 (Miss. 1968); Saucier v. Ross, 112 Miss. 306, 73 So. 49 (1916). In both these cases, *1183 it no doubt astonished each of these surgeons to learn that he had indeed left a foreign object in his patient's body during surgery. Had he not been confronted with the physical evidence to the contrary, he in all likelihood would have gone to his grave certain that such a thing never happened. Neither can Dr. Mladineo's recollection remove what these distinguished gynecologists with their own eyes observed. Although they did not find, nor were they looking for a foreign object, Drs. Boronow's and Lee's examination of Mrs. Samuels's vagina was every bit as conclusive as the physical findings in Long v. Sledge and Saucier v. Ross.
In sum, the weight of the evidence is overwhelming that Dr. Mladineo in his surgery removed too much of Mrs. Samuels's vaginal wall.

* * * * * *
As regrettable as this case is, it also has some heartwarming aspects. All surgeon witnesses were unquestionably highly skilled and well qualified.
A reverse phenomenon appears in this case from any malpractice case this Court has thus far experienced. Invariably it has been the defendant doctor who had the eminent physicians and specialists testifying in his behalf. The plaintiff has usually had to import a physician expert witness, who was considered an iconoclast. This Court is not unfamiliar with this phenomenon in disciplinary proceedings against a lawyer. There will be bushels of letters of commendation and a host of lawyers eager to testify what a marvelous lawyer he is, and if there are any at all, one or two solitary lawyers at most who offer any criticism. Moral courage can be a rare attribute at times.
In this case two eminent physicians testified against a prominent colleague, which could not have been pleasant. Yet in fulfilling this professional obligation, there has been, at least in the judgment of this Court, an inspiring uplifting of the medical profession.
Then there is Dr. Mladineo. The best airline pilot, the best bus driver, the best lawyer, if he stays at his game long enough, will sooner or later, at some time or another, make a mistake on his job. This is inevitable. He may be lucky and no one get hurt because of his mistake. He may be unlucky.
Neither does being a doctor remove you from being a human being. The same has got to be true of the best, the very top physicians and surgeons, and Dr. Mladineo would never have reached the position he occupies in the field of gynecological surgery unless he was exceedingly well qualified.
Greatness of character in any person requires the humble acknowledgement that when you make mistakes you must nevertheless continue.
REVERSED AND REMANDED FOR A NEW TRIAL.
ROY NOBLE LEE, C.J., DAN M. LEE, P.J., and PRATHER, ROBERTSON, SULLIVAN, BANKS and McRAE, JJ., concur.
PITTMAN, J., concurs in result only.

ON PETITION FOR REHEARING
McRAE, Justice, for the Court:
This medical negligence case was brought against the defendant, Dr. John Mladineo, who had diagnosed a significant pelvic relaxation and performed surgery by a vaginal hysterectomy and A and P repair on Barbara Morris Samuels. Mrs. Samuels sued and charged that the operation performed was below the standard of care and, as result, she could not have sexual relations. We reversed the lower court's judgment based on the overwhelming weight of the evidence as presented at trial and not by any outside source or extrarecord facts. Subsequent thereto, counsel for Dr. Mladineo filed motions for recusal of the entire Court and, in the alternative, at least the panel who heard this case, for having gone outside the record to create the facts, which assertion was incorrect. Those motions have been denied. The petition for rehearing now before this Court is *1184 also denied, but a further explanation is needed to make clear our position.
In the original opinion, we cited several medical treatises outside the record. The treatises in question related to the discussion concerning the surgery which Dr. Mladineo performed on the vagina and the abnormal amount of scar tissue remaining. The original opinion stated: "In such event, the excessive scar tissue formation did not simply cause the problem, it made the problem worse." The language of the opinion which cited treatises outside the record followed this sentence and stated:
Among the factors which may cause an abnormal amount of scar formation are "excessive tension on the wound, unfavorable site and inaccurate wound closure." R. Leichty and R. Soper, Synopsis of Surgery 7 (1985). See also, J. Thompson and J. Rock, Operative Gynecology 212 (1992); E. Perry, R. Corry and J. Perry, Basic Surgery Practice 67 (1987); A. Borges, Elective Incisions and Scar Revision 27 (1973)... .
The above language was simply surplusage and did not go to the heart of or give influence to our decision.
Simply put, a fact is a condition or event perceived and testified to by some witness. The only witnesses who testified from any first-hand knowledge of Mrs. Samuels' condition after she left the operating table were Mrs. Samuels, Dr. Boronow and Dr. Lee, the latter two from personal examinations of her after her surgery and discharge from the hospital. All three testified her vagina was too small to permit sexual relations. These, of course, were "facts" and weighed heavily on the issue of the verdict being contrary to the overwhelming weight of the evidence. Dr. Mladineo and his experts could not dispute that Mrs. Samuels' vagina was too small to prevent sexual relations because no one had made any personal observation or examination of the appellant subsequent to her discharge from the hospital.[1]
It is of interest, and it is noted, that most appellate courts, when dealing with complex issues, often resort to various periodicals and treatises to become familiar in understanding the subject matter at hand. In seeking to understand expert testimony from any specialized field, e.g., engineering, mechanics, medicine, etc., this Court is not confined to what is stated or explained in the trial record by witnesses, or counsel in a brief, but may resort to any and all authoritative sources. A judge or justice has the same responsibility to try and understand what a case is all about as a lawyer. This is part of our search for truth and justice.
The United States Supreme Court often resorts to authoritative sources other than the records and briefs, as shown in the treatise Frank, J., Marble Palace, (1958), where the author, a former clerk for Justice Black, stated:
[A] Justice like Brandeis may choose utterly to exhaust a subject. Justice Black on occasion has directed that books or articles broadly related to the subject of the opinion be collected in his own office so that he might read at large on the topic for some days before attempting to put a word to paper. In an admiralty case in which two Justices happened to be interested, they directed that a room be set aside in the Supreme Court building and that all the works in the Library of Congress on admiralty be assembled there, and they then had their law clerks extract from every one of those volumes anything that might possibly bear on the subject of the case in hand.
Id. at 114.
Further, the author pointed out:
The extent of the poking about and roaming of the Court is suggested by some of their footnotes. For the 1956-7 term those notes include all of the conventional legal materials, a large share of which may have been taken from the briefs of the attorneys. However, it is a good guess that in many instances these *1185 materials were found by the Court itself, as for example, quotations from debates in Congress, correspondence among government agencies, ... . Other 1956-7 items chosen at random which may or may not have come from the briefs: a reference to a 1937 study entitled Personnel Practices Governing Factory and Office Administration; a report from a Bar Association conference on delays of justice; a history of the operation of the Federal Employers' Liability Act; an address by Elihu Root to the American Bar Association in 1914; a report of a committee on tests for intoxication; miscellaneous reports on traffic safety; some historical materials on the number of automobiles in the United States; a handbook on fire protection; studies of comparative criminal procedure in England, France, and Italy; the Encyclopaedia of Social Sciences on railroad history; a whole series of works on the history of collective bargaining, developing the history of multi-employer labor negotiations.
Id. at 114-115.
T. Marvell, Appellate Courts and Lawyers, Ch. 13, 186 (1978) states:
If an appellate judge wishes to find or evaluate social facts through means other than those described in the preceding chapter, he must leave the legal milieu and learn from experts in other fields  that is, he must use scientific, social science, behavioral science, statistical, or other technical information about what happens in the world. (This wordy concept will be called "empirical data.") Appellate judges can obtain this information in several ways: (1) from the record through testimony or exhibits by professors and other experts introduced at the trial level or in an administrative hearing, (2) from arguments made in the briefs but outside the record, (3) from books and articles written by experts, and (4) by writing or talking directly to experts... .
As far back as 1942, the Harvard Law Review reported that United States Supreme Court justices often develop empirical facts of extra-record sources of information. Davis, An Approach to Problems of Evidence in the Administrative Process, 55 Harvard L.R. 364 (1942). That article points out that constitutional facts in the form of social and economic data appear in cases through the evidence along with the adjudicative facts, citing as a notable example the case of Borden's Farm Products, Inc. v. Baldwin, 293 U.S. 194, 55 S.Ct. 187, 79 L.Ed. 281 (1934). The article pointed out that Justice Brandeis, when he was a lawyer in the case of Muller v. Oregon, 208 U.S. 412, 28 S.Ct. 324, 52 L.Ed. 551 (1908), brought to the Court many facts which it used in making its decision:
In Muller v. Oregon, for example, the Court considered factual information contained in a brief filed by Mr. Louis D. Brandeis, including "extracts from over ninety reports of committees, bureaus of statistics, commissioners of hygiene, inspectors of factories, both in this country and in Europe... ." After Brandeis became a justice he continued his extensive factual studies and wrote many opinions saturated with facts brought to light through his own researches. In his celebrated opinion in Jay Burns Baking Co. v. Bryan, [264 U.S. 504, 520, 44 S.Ct. 412, 416, 68 L.Ed. 813 (1924)], he went outside the record to acquaint himself with "the art of bread-making and the usages of the trade; with the devices by which buyers of bread are imposed upon and honest bakers or dealers are subjected by their dishonest fellows to unfair competition; with the problems which have confronted public officials charged with the enforcement of the laws prohibiting short weights, and with their experience in administering those laws." The opinion contains dozens of references to books, articles, reports of committees, testimony before congressional committees, reports of state and municipal officers and agencies, federal administrative regulations, regulations adopted by the Conference on Weights and Measures, a 1917 letter from Herbert Hoover to President Wilson, results of an investigation by the Bureau of Chemistry, and many *1186 other similar references, with frequent quotations of statements, findings, opinions, beliefs, and points of view  all in utter disregard of any rules of evidence that would control adjudicative facts.
Davis, supra, at 403-403. The article went on to point that not only had the Supreme Court justices frequently relied upon the extra-record facts, but the facts relied upon in many instances did not come within the scope of judicial notice. Id. at 405.
Additional authorities support our conclusion that what was done was neither novel nor beyond the scope of judicial function. Ross v. Hoffman, 33 Md. App. 333, 364 A.2d 596 (1976); Bulova Watch Co. v. Hattori & Co., 508 F. Supp. 1322 (E.D.N.Y. 1981); Federal Rules of Evidence 201, Advisory Committee's note; K. Davis, 3 Administrative Law Treaties § 15.5 at 149 (2d ed. 1980).
Ross v. Hoffman involved a child custody dispute between the natural mother and a married couple who had kept the child during the week for a number of years. Welfare workers, the parties and psychologists testified. In making his decision, the chancellor referred to Goldstein, Freud and Solnick, Beyond the Best Interest of the Child, a book discussing what was in the best interest of children in custody disputes between persons who had the physical custody, "psychological parents," and natural parents, which obviously influenced the chancellor's thinking.
Upon appeal, the chancellor's use of this book was challenged. The Maryland Court responded:
We find no error in the fact that a trial judge continues his general education by reading, or that his reasoning is influenced by such education, or by his experiences during his lifetime. To expect either judge or juror to erase from memory all that he has read or experienced, not specifically related to the facts of the case is an absurdity so apparent as to deserve no rebuttal. Error would result when the reasoning was obviously distorted, but not when sound reasoning is influenced by prior experience or education. The soundness of the chancellor's reasoning here is apparent from the excerpts of his opinion. We do not find that he gave undue weight to that particular underpinning of his reasoning. Rather, we commend him both for recognizing and expressing that which helped him to decide.
33 Md. App. at 338, 364 A.2d at 600.
While we are not obligated to go beyond the record or briefs of counsel, neither are we obligated to exclude from our consideration any scientific law, fact or truth which helps to explain, amplify or affect the validity of an expert opinion. Moreover, when a decision in a case rests upon technical, specialized or scientific knowledge, if we find the record does not make the subject matter sufficiently clear, we will not hesitate to conduct authoritative study on our own. This is not to find additional "facts," but to understand and intelligently evaluate the facts in evidence.
Counsel does not have the right to exclude from our consideration any scientific truth, fact or law helpful in our determining the weight to be given evidentiary facts or expert opinions. There is nothing in counsel's petition which persuades us any statement in the questioned paragraph is inaccurate.
The original opinion stands as written. The petition for rehearing is denied.
PETITION FOR REHEARING DENIED.
ROY NOBLE LEE, C.J., and HAWKINS, P.J., and SULLIVAN, J., concur.
DAN M. LEE, P.J., concurs in results only.
PRATHER, PITTMAN and BANKS, JJ., would deny the petition for rehearing, but would modify the original opinion.
ROBERTS, J., not participating according to Supreme Court Internal Rules.
NOTES
[1] At one point Dr. Boronow testified Barbara had received "mutilating surgery." (Vol. II, 77)
[2] The perineum on a female is the external surface lying between the vulva and anus.
[3] Dr. Lee said the space was approximately five centimeters (two inches) wide.
[4] Although Mrs. Samuels testified Dr. Mladineo indeed examined her May 13, 1986, and it was very painful, at trial he had no recollection of having examined her, and in his pretrial deposition testified he had not examined her on this six-week checkup.
[1] Mrs. Samuels said Dr. Mladineo examined her post-operatively, but Dr. Mladineo said he did not.